**STATE of Tennessee**

v.

**Stacey Joe CARTER.**

**No. M2005–02784–SC–R11–CD.**

Supreme Court of Tennessee, at Nashville.

Feb. 14, 2008 Session.

May 19, 2008.

Code Ann. § 50–6–241(d)(2)(B).

Roger E. Nell, District Public Defender, Clarksville, Tennessee, and Charles S. Bloodworth, Sr., Asst. District Public Defender, Springfield, Tennessee, for the appellant, Stacey Joe Carter.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Senior Counsel; John Wesley Carney, Jr., District Attorney General; Dent Morriss and Jason White, Asst. District Attorneys General, for the appellee, State of Tennessee.

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

## OPINION

We granted the Defendant's application for permission to appeal in order to address how the 2005 revisions to the Criminal Sentencing Reform Act of 1989 impact the method of imposing a sentence. The Defendant was convicted by a jury of vehicular homicide and driving on a suspended license. The trial court sentenced the Defendant to serve ten years for the homicide and eleven months twenty-nine days for the driving offense, to be served concurrently. The trial court suspended both sentences. The State appealed, and the Court of Criminal Appeals reversed the trial court's judgment and modified the Defendant's homicide sentence to fifteen years to serve. We hold that the trial court committed no reversible error in sentencing the Defendant to ten years on the homicide offense, but did commit reversible error in placing the Defendant on probation. We reinstate the Defendant's ten-year sentence and order that it be served in the Department of Correction.

## FACTUAL AND PROCEDURAL BACKGROUND

As a preliminary matter, we note that the events leading up to the Defendant's prosecution began in the small town of Guthrie, Kentucky, located very near the Tennessee border and the Tennessee counties of Robertson and Montgomery. The unfortunate death of the victim occurred in Robertson County, Tennessee.

### I. Trial

Ronnie Shaw testified that he lived in a Winnebago next to his sister Pamela Shaw's house in Guthrie, Kentucky. He was standing in the yard on the night of October 23, 2004, when Stacey Joe Carter ("the Defendant") pulled up driving a small red car. With the Defendant was "[s]upposedly ... his nephew." The Defendant asked Mr. Shaw "where he could find thirty dollars worth of crack [cocaine]." Mr. Shaw replied, "no, not at this time." Mr. Shaw recalled that his sister, Pamela, and his niece then came out of the house and demanded that the Defendant leave. The Defendant left. Mr. Shaw saw him again ten to fifteen minutes later being followed by the police. According to Mr. Shaw, "They was [sic] behind him, they didn't put the lights on him until he hit State Street."

Pamela Shaw testified that she lived on Lizzie Dancy Street in Guthrie, Kentucky. Between 10:30 and 10:45 on the night of October 23, 2004, she saw the Defendant after he pulled into her driveway and she looked out her bedroom window. She stated that the Defendant was driving "a small red vehicle" and in the passenger seat was a "stocky built" male. Ms. Shaw knew the Defendant because they had attended the same elementary school in Guthrie. The Defendant had some words with her brother, Ronnie Shaw. Ms. Shaw's daughter went to the kitchen door and shouted at the Defendant, who then left. Ms. Shaw heard sirens a few minutes later.

Officer Matthew Dolezal of the Guthrie, Kentucky, Police Department testified that he was working as a narcotics officer on the night of October 23, 2004. With his Chief's permission, his wife was riding in his patrol car with him. He was driving down First Street in Guthrie when he saw a red Nissan Sentra in the vicinity of Merritt and First Street. The Nissan was parked and a black male was at the window. Officer Dolezal thought he recognized the black male. He approached the Nissan in his patrol car. The Nissan "rapidly accelerated in reverse and continued up the next block and hung a right." The Nissan continued in reverse for about 100 feet and the black male "took off running." Officer Dolezal accelerated in an attempt

to catch up to the Nissan. The driver of the Nissan "started disregarding the stop signs throughout that city block." Officer Dolezal explained that the Nissan ran two stop signs, and he considered the car's operation "reckless." The Nissan turned onto Highway 41, the main road out of Guthrie.[1] Officer Dolezal testified that he "initiate[d][his] emergency equipment to make the traffic stop, establishing that this subject had recklessly endangered his passenger and was also breaking the law." The driver of the Nissan did not stop after Officer Dolezal turned on his blue lights. A few seconds later, Officer Dolezal turned on his video camera.

At this point, the Nissan was travelling between fifty-five and sixty miles per hour in a forty-five mile per hour zone. The Nissan was still in Kentucky but entered Tennessee in one to two hundred yards. Officer Dolezal testified, "The driver was weaving all over the road . . . going into opposing lanes of traffic and then doubling back." Officer Dolezal shone his spotlight on the car and described the occupants: "a heavy-set male [in] the passenger seat that had short hair and then there was another white male that had long hair, driving the vehicle."

Officer Dolezal radioed for back-up. Guthrie Police Department Officer Jeff Ford[2] joined in the chase and formed a "rolling road block" by getting in front of the Nissan. Although Officer Ford tried to slow the Nissan down, the officers were unable to stop it. Instead, as the three cars approached Mint Springs Road on the left, Officer Ford passed the road and the Nissan "took a hard turn left" onto Mint Springs Road. Officer Dolezal followed the Nissan. The Nissan "continued the same

driving behavior, still going into opposing lanes of traffic, still failing to yield, continued driving somewhat more recklessly now that [they were] entering a curvy country road." Their speed continued to be "approximately maybe fifty-five, sixty." Officer Dolezal began to fall back, however, because he was not familiar with the road.

At the point that Mint Springs Road involves a set of double "S" curves, Officer Dolezal saw the Nissan's brake lights come on. Officer Dolezal stated that the driver "locked up the vehicle" and the driver "never even made the turn." Instead, the vehicle missed the curve leading into a bridge and "just went straight off." The Nissan went "over an embankment and . . . landed upside down in a river."

Officer Dolezal stated that, when he looked over the bridge, he saw the Defendant in the water. Officer Ford got in the water and yelled at the Defendant to come help him with the passenger in the Nissan. According to Officer Dolezal, the Defendant replied, "[F]—k you," and "continued to walk underneath the bridge in this water." Officer Ford began trying to break into the Nissan but was not successful. Meanwhile, the Defendant climbed an embankment up to the road where Officer Dolezal took custody of him at gunpoint. After he was handcuffed, the Defendant advised Officer Dolezal that it was his nephew in the Nissan.

After Officer Dolezal placed him in custody, the Defendant was transferred to the Tennessee Highway Patrol ("THP") because he was in their jurisdiction. The ensuing investigation was also handled by the THP.

---

1. A car traveling south on U.S. Highway 41 out of Guthrie, Kentucky, enters Tennessee in Montgomery County. Continued travel leads to Robertson County, Tennessee.

2. At the time of trial, Officer Ford was no longer employed by the Guthrie Police Department.

Officer Ford testified that he responded to a "back up" request from Officer Dolezal as Officer Dolezal was trying to pull the Nissan over in Guthrie. He caught up with Officer Dolezal and then passed the Nissan in order to create a "rolling road block." Officer Ford had managed to slow the speed of the three vehicles "quite considerably" when he passed a road on the left. The Defendant turned suddenly onto the road. Officer Ford made a U-turn and then "got in behind Officer Dolezal." All three vehicles were in Tennessee at this point.

Officer Ford described his speed after he got behind Officer Dolezal as "about fifty-five, sixty maximum there towards the end." Officer Ford arrived at the scene just after the Defendant's car left the road and went into the water. Officer Ford ran down the embankment and saw the Defendant "finally emerge from the water, from the driver's side of the car." Officer Ford pulled his weapon but the Defendant ran away from him to the other side of the bridge. Officer Ford kept yelling at the Defendant to stop. The Defendant turned around and said, "my nephew is still in the car." The Defendant continued to move away from the car, "yelled some profanities," and then went underneath the bridge. Officer Ford lost sight of the Defendant.

Officer Ford then waded into the water to the car in an attempt to rescue the Defendant's nephew. The water reached to just underneath Officer Ford's chin. He tried to open the passenger door but could not. He moved to the driver's side where the door was open. He tried to get into the car but because the roof was crushed, he "couldn't get too far into it." He did not find the Defendant's nephew. He and another officer who had entered the water tried unsuccessfully to break the passenger door window.

Steven Ellis of the Guthrie Volunteer Fire Department testified that he responded to the scene.[3] He stated that the windows of the Nissan were all up and the door they were trying to open was locked. The windows were under water. One of the responders broke a window with an axe and they were then able to open one of the doors. Emergency response personnel were then able to recover the passenger from the Nissan. He was deceased. Officer Dolezal described the body as a "[v]ery large male ... of a younger appearance ... approximately six foot, three hundred plus, short brown hair."

THP Trooper Kenneth Harrison also responded to the scene when called by the Guthrie Police Department. Although assigned to Montgomery County, he was the first THP officer on the scene and took over the investigation. He then called for the Robertson County trooper on duty and for a Critical Incident Response Team member to respond. He testified that the accident occurred in Robertson County, Tennessee. He spoke briefly with the Defendant, whom Trooper Harrison described as "visibly upset and ... very emotional and crying. He realized that his nephew didn't get out of the vehicle." The Defendant complained of pain in his back and neck, and Trooper Harrison transported him to a local hospital.

Dr. Charles Harlan, as the Robertson County Medical Examiner, performed an autopsy on the victim and testified that he did not see anything that looked like a seat belt injury. The victim was fifteen years old, six feet three inches tall, and weighed 340 pounds. Testing revealed that the victim had a blood alcohol content of .243,

---

**3.** Mr. Ellis testified that, on the way to the scene, he crossed paths with a rescue vehicle from Montgomery County, Tennessee, which was also responding to the accident.

rendering the victim "medically intoxicated." Dr. Harlan opined that the victim "died as a result of drowning."

THP Trooper Michael McAlister testified that he is a member of the Critical Incident Response Team and participates in reconstructing "fatal crashes." He responded to the instant crash and assumed primary responsibility for reconstructing the accident. Based on his measurements and calculations, he determined fifty miles per hour as the maximum speed at which a car could be driven through the curve leading to the bridge. He also determined that the average speed of the Defendant's vehicle during the 5,055 feet preceding the bridge was seventy-one miles per hour.

Upon considering this evidence, including a videotape of the pursuit from Officer Dolezal's onboard camera, the jury found the Defendant guilty of vehicular homicide, a Class C felony,[4] and driving on a suspended license, a Class B misdemeanor.[5]

## II. Sentencing Hearing

At the sentencing hearing,[6] the State introduced proof, without objection, that the Defendant had sufficient prior convictions to be sentenced as a Range III persistent offender. *See* Tenn.Code Ann. § 40–35–107(a), (c) (2006). The presentence report, also admitted into evidence without objection, indicates that the Defendant was on parole from Kentucky felony convictions and on probation from a Tennessee felony conviction at the time he committed the instant offenses. The report further indicates that the Defendant has misdemeanor convictions in addition to those necessary to establish his sentencing range. In mitigation, the defense referred

to the victim impact statement prepared by the victim's mother (the Defendant's sister) in which she asked the court to probate the Defendant's sentence and also offered several letters from other family members asking for leniency. The defense also argued that the trial court should consider "the nature of uncharged, unindicted persons who also contributed to the injuries suffered by the deceased. The officers were not charged. Even though their actions directly lead [sic] to the death of the deceased, but they were wrapped up [in] police uniforms and police cars from another state, from another jurisdiction."

The Defendant also made a statement on his own behalf:

> I lost a lot that day. I know I made a wrong judgment about everything. I've been in trouble a little bit. Maybe that's what I—got me for it at first, but I never would hurt my nephew, no way, no how. I've got an 11–year-old boy. He was just like my boy. I took him fishing every day and everything. Wasn't doing no drugs; I wasn't drinking or nothing. I stopped all that a long time ago.
>
> My sister, I mean, that's all I got; her and my niece, my kids and my daddy. He's about gone; I don't have a momma. But that's all I got in this world, you know what I'm saying?
>
> I just—I don't—I don't know how to take none of this. I've been sitting down there a year; ain't had no kind of doctor, no kind of mental help or nothing like that, you know what I'm saying? I've been going through a lot of stuff, but I've dealt with it. And I just ask for

---

4. Tenn.Code Ann. § 39–13–213(a)(1), (b) (2003).

5. Tenn.Code Ann. § 55–50–504(a)(1) (2004).

6. The Defendant elected to be sentenced pursuant to the statutes in effect for crimes committed on or after June 7, 2005. *See* Act of June 7, 2005, ch. 353, 2005 Tenn. Pub. Acts § 18.

consideration in my part, you know what I'm saying, what I've went through, my family's went through because of all this.

Upon considering the proof, the Defendant's statement, and argument by counsel, the trial court ruled as follows:

[The Defendant] is before the Court having been convicted of a class C felony; that is vehicular homicide. He is a range three offender and, therefore, the range of punishment is 10 to 15 years. He was also convicted of driving on a suspended license, which carries [a] maximum of 11 months and 29 days. He has more than satisfied a maximum sentence for that [by his pretrial jail time]. So the Court sentences him to 11 months and 29 days [for the misdemeanor], which has been satisfied.[7]

Now, regarding the felony conviction for vehicular homicide. The Court has considered all of the factors set out at 45–35–210, which is as follows: The evidence which was received at the trial of this case and the evidence which has been received at this sentencing hearing. The Court has also considered the presentence report and the victim impact statements in the form of not only a statement but letters. The Court has considered the principles of sentencing and arguments as to sentencing alternatives. The Court has considered the nature and characteristics of the criminal conduct involved.

The Court has considered information offered by the parties regarding enhancement and mitigating factors set out [in] TCA sections 40–35–113 and 40–35–114, and the Court has considered

the statement made by the Defendant in his own behalf.

. . . .

The Defense, at trial and here today, has strongly as possible insisted that it was important the night that [the victim] died that the conduct of [the Defendant] was not the only conduct that gave rise to and proximately caused the death of [the victim]. And after hearing all of the evidence at trial this Court believes that the death of [the victim] was proximately caused by two or more persons working concurrently to proximately cause the death.

[The Defendant] was indicted and was convicted for his acts, but others were not. They were acting without—without—outside their jurisdiction. They were not chasing a fleeing felon. They should not have done what they did. It was wrong. And the conduct of the officers in conjunction with [the Defendant] caused the death of [the victim]. That's important when it comes to figuring out what to do with [the Defendant].

In light of the length of time that he has served in confinement, in light of the likelihood that further confinement would serve any purpose of—toward rehabilitating [the Defendant] as it pertains to the death of [the victim], in light of the family's view, and in light of the whole situation and why [the victim] is dead it would be—it is justice to grant the Defendant's motion, and the Court sentences him to ten years, time served, probated,[8] consecutive [to sentences for prior convictions] as requested.

7. As noted above, the Defendant's driving offense is a Class B misdemeanor. The maximum sentence for a Class B misdemeanor is six months. Tenn.Code Ann. § 40–35–111(e)(2) (2006). We order the trial court to correct the judgment document accordingly to reflect a sentence of six months.

8. We note that although the trial court used the term "probated," the written judgments entered into the record erroneously recite that the Defendant was sentenced to ten years on Community Corrections as to both the felony and misdemeanor convictions. The dates set forth for pretrial jail credit also appear to be

The State appealed the sentence and the Court of Criminal Appeals modified the Defendant's sentence for the homicide to fifteen years (the maximum permitted within the range), a sentence not eligible for probation and therefore required to be served in the Department of Correction. The Defendant appealed. We reinstate the Defendant's ten-year sentence but order that it be served in the Department of Correction.

## ANALYSIS

### I. Length of Sentence

The Criminal Sentencing Reform Act of 1989 ("the Sentencing Act") creates a matrix by which convicted criminal defendants are sentenced based upon the seriousness of the crime committed and the number of prior convictions the defendant has. For instance, a vehicular homicide by a means other than driver intoxication is a Class C felony. *See* Tenn.Code Ann. § 39–13–213(b) (2003). A Class C felony is punishable by a term of three to fifteen years, depending upon the number and nature of any prior convictions adjudged against the defendant. *See id.* § 40–35–112(a)(3), (b)(3), (c)(3) (2006). The number of prior convictions, if any, places the defendant within a "range" and the defendant is then sentenced to a term of years within that range. *See id.* §§ 40–35–105 to –109. For instance, a "Range I" sentence for a Class C felony is three to six years, *id.* § 40–35–112(a)(3), while a "Range III" sentence for a Class C felony is ten to fifteen years, *id.* § 40–35–112(c)(3).

Prior to 2005, the Sentencing Act set forth a "presumptive sentence" to be imposed within the applicable range: the minimum sentence for all felonies other than Class A felonies, and the midpoint sentence for Class A felonies. *Id.* § 40–35–210(c) (2003). Thus, in imposing a specific sentence within a given range, the trial court began with the presumptive sentence. *See id.; State v. Gomez,* 239 S.W.3d 733, 739 (Tenn.2007) ("A sentencing court could not increase a defendant's sentence above the presumptive sentence except upon the application of statutory enhancement factors."). If the trial court determined that statutory enhancement factors applied, *see* Tenn.Code Ann. § 40–35–114 (2003), the trial court had the authority to increase the presumptive sentence up to the maximum within the range, *see id.* § 40–35–210(d). If the trial court determined that statutory mitigating factors also applied, *see id.* § 40–35–113, the trial court could reduce the enhanced sentence, *see id.* § 40–35–210(e) ("Should there be enhancement and mitigating factors for a Class B, C, D or E felony, the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, then reduce the sentence within the range as appropriate for the mitigating factors."). The weight the trial court accorded any applicable enhancement and mitigating factors was left to the trial court's discretion. *Id.,* Sentencing Comm'n Cmts.; *Gomez,* 239 S.W.3d at 739–40.

Our legislature amended the Sentencing Act in 2005 after the United States Supreme Court issued its opinion in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). In *Blakely,*

---

erroneous on the misdemeanor judgment. In conjunction with our remand of this matter, we instruct the trial court to correct the erroneous judgment documents. We further instruct the trial court to add to the homicide judgment the following provision: "The Defendant is prohibited from driving a vehicle in this state for a period of ten (10) years." *See* Tenn.Code Ann. § 39–13–213(c) (2003).

the high court decided that "[i]f the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." *Cunningham v. California,* 549 U.S. 270, 127 S.Ct. 856, 869, 166 L.Ed.2d 856 (2007) (citing *Blakely,* 542 U.S. at 305 & n. 8, 124 S.Ct. 2531). In order to avoid the constitutional violation arising from a trial court increasing a presumptive sentence on the basis of judicially-determined enhancement factors, the General Assembly revamped section –210 to provide as follows:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, *the court shall consider, but is not bound by, the following advisory sentencing guidelines:*
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40–35–113 and 40–35–114.

Tenn.Code Ann. § 40–35–210(c) (2006) (emphasis added).

The amended statute no longer imposes a presumptive sentence. Rather, the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]."[9] *Id.* § 40–35–210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," *id.* § 40–35–102(1), a punishment sufficient "to prevent crime and promote respect for the law," *id.* § 40–35–102(3), and consideration of a defendant's "potential or lack of potential for ... rehabilitation," *id.* § 40–35–103(5). In sentencing a defendant, the trial court is required to consider the following:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40–35–113 and 40–35–114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

*Id.* § 40–35–210(b).

As did the earlier statute, the revised section –210 requires the trial court to "place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* at (e). In keeping with the changes to section –210, the statutory provision set-

---

**9.** The purposes and principles of the Sentencing Act are set forth at Tennessee Code Anno-

tated sections 40–35–102 and –103.

ting forth the enhancement factors now indicates that the factors are "advisory." *Id.* § 40–35–114.

The defendant or the State may appeal a trial court's sentencing decision. *See id.* §§ 40–35–401, –402 (2006). The burden of demonstrating that a sentence is erroneous is upon the party appealing. *Id.*, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991). Prior to the 2005 amendments, a defendant could appeal on the basis that "[t]he enhancement and mitigating factors were not weighed properly, and the sentence is excessive under the sentencing considerations set out in § 40–35–103." Tenn.Code Ann. § 40–35–401(b)(2) (2003). Similarly, the State could appeal on the basis that "[t]he enhancement and mitigating factors were not weighed properly." *Id.* § 40–35–402(b)(5). Significantly, the 2005 amendments deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. Rather, a defendant may now appeal on the basis (among others) that the sentence "is excessive under the sentencing considerations set out in §§ 40–35–102 and 40–35–210," *id.* § 40–35–401(b)(2) (2006), and the State may now appeal on the added basis (among others) that the sentence "is inconsistent with the purposes or considerations of sentencing set out in §§ 40–35–102 and 40–35–103," *id.* § 40–35–402(b)(7).

Given the revisions to section –210, these changes to the appeals provisions make sense. Prior to 2005, a defendant was entitled to the presumptive sentence unless the trial court properly applied statutory enhancement factors. Currently, the trial court "shall consider, but is not bound by" an "advisory sentencing guideline" that suggests an adjustment to the defendant's sentence upon the presence or absence of mitigating and enhancement factors. *Id.* § 40–35–210(c). Thus, the 2005 revision to section –210 increases the amount of discretion a trial court exercises when imposing a sentencing term.[10]

As to the standard of review, the Sentencing Act provides that, "[w]hen reviewing sentencing issues raised [by a defendant] pursuant to [this section], including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." *Id.* § 40–35–401(d); *see also id.* § 40–35–402(d) ("When reviewing sentencing issues raised [by the State] pursuant to this section, the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct."). Our case law has long held that the presumption of correctness "is conditioned upon the affirmative showing

10. The Defendant asserts in his brief that "[t]he tenor of the 2005 amendments is that the *only* limitations on the discretion of the trial court are the bounds of the applicable range." (emphasis added). While our holding relieves us of the necessity of addressing this assertion, we note that every sentence imposed pursuant to the Sentencing Act must comport with the purposes set forth at Tennessee Code Annotated section 40–35–102 and the principles codified at section –103. See Tenn.Code Ann. § 40–35–210(b)(3), (d) (2006); *State v. Ross*, 49 S.W.3d 833, 847 (Tenn.2001) ("On appeal, we will uphold the ultimate sentence imposed by the trial court so long as (1) it complies with the purposes and principles of the 1989 Sentencing Act, and (2) its findings are adequately supported by the record.").

in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Ashby*, 823 S.W.2d at 169. If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails. *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn.Crim.App.1992). In that event, "our review is simply de novo." *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004).

■ In this case, the trial court imposed the minimum sentence in the applicable range: ten years.[11] Although the court made no reference to specific enhancement or mitigating factors, it "considered information offered by the parties regarding enhancement and mitigating factors set out [in] TCA sections 40–35–113 and 40–35–114." In this regard, the State introduced proof that the Defendant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; that he, "before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; and that "[a]t the time the felony was committed, one (1) of the following classifications was applicable to the defendant: ... (B) Released on parole; (C) Released on probation." Tenn.Code Ann. § 40–35–114(1), (8), (13)(B), (C) (2006). The defense introduced requests for leniency from the Defendant/victim's family and emphasized the conduct of the Kentucky officers in pursuing the Defendant. *See* Tenn.Code Ann. § 40–35–113(13). On review, the Court of Criminal Appeals determined that the trial court "failed to appropriately adjust the sentence length due to the presence of enhancement factors and ... based the sentence on a mitigating factor not supported by the proof," referring to the Guthrie, Kentucky, police officers' conduct in pursuing the Defendant. The intermediate appellate court thereupon increased the length of the Defendant's sentence for the vehicular homicide conviction to the Range III maximum of fifteen years.

The Court of Criminal Appeals' use of the phrase "failed to appropriately adjust" indicates that the court disagreed with the trial court's weighing of the various enhancement and mitigating factors before it. Such a disagreement is not grounds for reversal under the revised Sentencing Act, however. *See State v. Banks*, No. W2005–02213–CCA–R3–DD, 2007 WL 1966039, at *48 (Tenn.Crim.App. July 6, 2007) (recognizing that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

As set forth above, a trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its dis-

**11.** There has been no challenge to the Defendant's Range III status.

cretion in setting the length of a defendant's sentence.

■ Although Tennessee's appellate courts retain the statutory authority to increase sentences upon appeal by the State, Tenn.Code Ann. § 40–35–402(c) (2006), we hold that they do not have the authority to do so simply upon the basis of a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors. As set forth above, revised section 40–35–210(c) of the Sentencing Act mandates that the trial court "shall impose a sentence within the range of punishment." In determining which sentence within the range to impose, however, the trial court is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors. An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections –102 and –103 of the Sentencing Act.

While we are uncomfortable with the trial court's decision to impose the minimum sentence on the Defendant, we do not think the trial court departed so far from the Sentencing Act as to rebut the presumption of correctness. The trial court considered all of the criteria set out in section –210(b); it imposed a sentence within the applicable range; it set forth its reasons for imposing the sentence that it did; and the relevant findings are adequately supported by the record. *See State v. Pike,* 978 S.W.2d 904 app. at 926–27 (Tenn.1998) (observing that, if appellate review "reflects that the trial court followed the statutory sentencing procedure [and] imposed a lawful sentence after having given due consideration ... to the ... principles set out under the sentencing law, and [if] ... the trial court's findings are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result").

While reasonable minds can differ over whether the minimum ten-year term is consistent with the Sentencing Act's purposes and principles, the trial court did not go so far astray under the 2005 expansion of discretion as to render the sentence reversible. We question whether the record in this case contains sufficient facts or findings to justify mitigating the Defendant's sentence on the basis of the Guthrie police officers' conduct in pursuing him. Nevertheless, the trial court was within its discretionary bounds to consider as mitigation "[a]ny other factor consistent with the purposes of [the Sentencing Act]," Tenn.Code Ann. § 40–35–113(13) (2006), including the requests for leniency and the Defendant's expression of remorse. Accordingly, the presumption of correctness attaches to the trial court's decision to sentence the Defendant to ten years for the homicide offense. Because insufficient grounds exist on the record before us to overcome the presumption, we reverse the judgment of the Court of Criminal Appeals imposing a fifteen-year sentence and reinstate the Defendant's ten-year sentence.

## II. Manner of Service

Because we have reinstated the Defendant's ten-year sentence, we must also address whether the trial court erred in placing the Defendant on probation. The 2005 revisions to the Sentencing Act also affect grants of probation.

Prior to the 2005 revisions, a defendant was eligible for probation "if the sentence actually imposed upon such defendant is eight (8) years or less" and the defendant was not convicted of certain crimes. Tenn.

Code Ann. § 40–35–303(a) (2003). Moreover, certain defendants were entitled to a presumption that they were "favorable candidate[s] for alternative sentencing options." Tenn.Code Ann. § 40–35–102(6) (2003).

Pursuant to the 2005 revisions, the Sentencing Act now provides that "[a] defendant shall be eligible for probation under the provisions of this chapter, if the sentence actually imposed upon the defendant is ten (10) years or less." Tenn.Code Ann. § 40–35–303(a) (2006). No longer is any defendant entitled to a presumption that he or she is a favorable candidate for probation, however. The 2005 amendments revised section –102(6) such that it now provides: "A defendant who does not fall within the parameters of subdivision (5),[12] and who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. A court shall consider, but is not bound by, this advisory sentencing guideline." *Id.* § 40–35–102(6).

The Defendant is therefore eligible for probation. He does not qualify for favorable status consideration, however, because he is a persistent offender. *See id.*

■ The Sentencing Act continues to provide that "the burden of establishing suitability for probation rests with the defendant." *Id.* § 40–35–303(b). This burden includes demonstrating that probation will " 'subserve the ends of justice and the best interest of both the public and the defendant.' " *State v. Housewright,* 982 S.W.2d 354, 357 (Tenn.Crim.App.1997)

(quoting *State v. Bingham,* 910 S.W.2d 448, 456 (Tenn.Crim.App.1995)).

The 2005 amendments to the Sentencing Act did not alter the factors a trial court considers when deciding whether to suspend an eligible defendant's sentence. Several principles apply:

> (5) In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

Tenn.Code Ann. § 40–35–102(5) (2006). Additionally,

> (1) Sentences involving confinement should be based on the following considerations:
>
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn.Code Ann. § 40–35–103(1) (2006).

■ In this case, the trial court awarded probation on the grounds that: (1) the

---

**12.** Subdivision (5) of Tennessee Code Annotated section 40–35–102 (2006) provides:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal

histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

Defendant had already served approximately a year in jail awaiting trial; (2) further confinement would not aid in the Defendant's rehabilitation "as it pertains to the death of [the victim]"; (3) the family of the Defendant and victim desired leniency; and (4) "in light of the whole situation and why [the victim] is dead." Apparently, the trial court gave no consideration to the previous unsuccessful attempts to rehabilitate the Defendant through measures less restrictive than confinement, a significant factor in this case because the Defendant was on release status from multiple prior felony sentences when he committed the instant offenses. Accordingly, the presumption of correctness does not attach to the trial court's decision to place the Defendant on probation.

In our de novo review of the facts and circumstances of this case and of the Defendant, we hold that the Defendant has not carried his burden of establishing his suitability for probation and has not established that the suspension of his sentence serves the ends of justice or the best interest of the public. The Defendant possesses a significant criminal history. At least as damning is the fact that the Defendant was on both probation and parole when he committed the instant offenses. Clearly, albeit in retrospect, these past grants of leniency were ill-advised. The Defendant's conduct while on release status demonstrates that he does not take seriously the need for his rehabilitation. The Defendant's history establishes that he should not be given probation for the instant homicide offense. *See* Tenn.Code Ann. § 40–35–103(1)(A), (C).

We also hold that the Defendant's conduct in causing his nephew's death was sufficiently reprehensible and offensive, and the nature of the offense is such, as to require incarceration to avoid depreciating the seriousness of the offense. *See id.* at (1)(B); *State v. Trotter,* 201 S.W.3d 651, 654 (Tenn.2006). For no legitimate reason, the Defendant refused to yield to a patrol car and instead initiated a high-speed chase. With the Defendant was his severely intoxicated fifteen-year-old nephew. The Defendant lost control of his car and landed upside down in a river while trying to avoid apprehension. The Defendant managed to escape the car and, rather than assist his nephew to do likewise, continued trying to outrun the officers. Unable to escape the car, the Defendant's nephew drowned.

The Defendant's profound disregard for the safety of others while attempting to avoid apprehension is deeply disturbing to this Court. Moreover, while we appreciate the Defendant's (and thus the victim's) family's pleas for leniency, we are troubled by the message such leniency would send. Accordingly, we hold that the Defendant is not entitled to probation on his ten-year sentence for vehicular homicide and must serve his sentence in the Department of Correction.

## CONCLUSION

The judgment of the Court of Criminal Appeals imposing a fifteen-year sentence on the Defendant for his vehicular homicide conviction is reversed and the Defendant's ten-year sentence for that offense is reinstated. We reverse the trial court's grant of probation. The Defendant's concurrent sentence for the misdemeanor offense is corrected to six months. This matter is remanded to the trial court for entry of judgments reflecting a sentence of ten years to serve on the homicide offense, six months on the driving offense, and to correct the additional errors on both judgments noted above.

It appearing that the Defendant is indigent, the costs of this cause are taxed to the State of Tennessee.