# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 17, 2010 Session

## STATE OF TENNESSEE v. JOSEPH BRENNAN

**Appeal from the Criminal Court for Sumner County**
**No. 358-2008     Dee David Gay, Judge**

_____

**No. M2009-00895-CCA-R3-CD - Filed April 9, 2010**

_____

The Defendant, Joseph Brennan, was charged with two counts of rape of a child, a Class A felony, and two counts of incest, a Class C felony. See Tenn. Code Ann. §§ 39-13-522(b)(1), -15-302(b). He pleaded guilty to two counts of incest and two counts of attempted rape of a child, a Class B felony. See Tenn. Code Ann. § 39-12-107(a). In accordance with his plea agreement, the trial court sentenced the Defendant, as a Range I, standard offender, to ten years for each attempted rape of a child conviction and three years for each incest conviction, his sentences for attempted rape of a child to be served consecutively to each other and concurrent with his incest sentences, for a total effective sentence of twenty years. Following the Defendant's sentencing hearing, the trial court ordered service of his full sentence in the Department of Correction. In this direct appeal, the Defendant contends that the trial court erred in denying him a sentence of split confinement. After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, Joseph Brennan.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Lawrence R. Whitley, District Attorney General; and Sallie Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

Testimony in this case was heard at the Defendant's sentencing hearing, held on April 3, 2009. Detective Dirk Witherow of the Hendersonville Police Department testified that he acted as the lead investigator in the Defendant's case. He had, in the past, received training specific to child sexual abuse cases. On January 10, 2008, Det. Witherow received a fax referral from Morgan Radley, the victim's Department of Children's Services ("DCS") case worker. The victim was ten years old, and the Defendant was nineteen years old. The Defendant and victim are siblings by adoption. At that time, the Defendant and his family had lived in Tennessee for about five months, having moved from Pennsylvania.

Detective Witherow explained that the charges against the Defendant originally arose from a report given to Pennsylvania authorities by an acquaintance of the Defendant named Muriel Skuba. Ms. Skuba reported that the Defendant had sexually abused the victim in both Pennsylvania and Tennessee. Detective Witherow and Ms. Radley interviewed the victim at her school on January 11. The victim confirmed that she had been abused by the Defendant in both states; the first instances of abuse occurred when the victim was five years old.

Detective Witherow also learned that there had been no police involvement in Pennsylvania. At that point in his investigation, Det. Witherow was informed that the Defendant had hired an attorney and that the family planned to move to North Carolina. DCS then took the victim into its care, and the Defendant turned himself in to police through his attorney. Detective Witherow introduced into evidence a medical report on the victim.

Ms. Radley testified that she interviewed the victim and the Defendant's younger brother, Ryan, who disclosed some knowledge of the Defendant's criminal conduct in Pennsylvania. Ms. Radley confirmed that the victim and Ryan were still in the State's custody at the time of sentencing. She also introduced into evidence a report on the victim from the Pennsylvania equivalent of DCS.

Donna Moore, a psychologist qualified as an expert in the evaluation and treatment of sex offenders, testified that she evaluated the Defendant by interviewing him and by examining Pennsylvania's DCS-equivalent records, records from inpatient therapy the Defendant had received at a clinic in Montana, and the records of another evaluating doctor, Dr. Allister Finlayson. Dr. Moore testified that the Defendant had received some counseling after first being accused of sexual abuse in Pennsylvania in 2004. At that time, the

Defendant had been diagnosed with mild depression and attention deficit hyperactivity disorder ("ADHD"). No assessment of the Defendant's recidivism risk was conducted.

The Defendant, in his interview with Dr. Moore, detailed his abuse of the victim as well as his other sexual activities. The Defendant noted that he had, before abusing his sister, masturbated using adult internet pornography and chat rooms and read pornographic stories involving incest. He denied that he had viewed child pornography at that time, but admitted that he had done so between his 2004 abuse of the victim and his family's move to Tennessee.

Regarding his abuse of the victim, he said that in 2004, he had performed cunnilingus on the victim and forced her to perform fellatio on him. He attempted to penetrate the victim vaginally but was unable to do so due to her small size. The Defendant denied that he had ever been physically violent in sexual relationships with the victim or with same-age peers, but admitted that he verbally intimidated people in order to get what he wanted. He said he had yelled at the victim. The Defendant denied ever abusing his brother Ryan. He said he chose the victim instead of his older sisters because they were more likely to tell someone what he had done. He also noted that he never ejaculated on the victim because "that would be wrong," but admitted that he might have forgotten he did so.

The Defendant's abuse of the victim stopped after a few occurrences in 2004. It did not resume until 2007. In the interim, the Defendant's parents put in place a "safety plan" under which the Defendant was never to be alone with the victim. The Defendant was also placed in a highly structured Catholic school. Eventually, however, the Defendant began to view pornography again. Soon after moving to Tennessee in 2007, the Defendant "worked around" the safety plan, abusing the victim again, waiting until both his father and mother were either asleep or out of the house. After a few occurrences, it appears that he told Ms. Skuba about his actions, resulting in her reports to Pennsylvania and Tennessee authorities. Ms. Skuba also reported that she had been sexually involved with the Defendant, and that he had verbally intimidated her during that sexual relationship. After this report, the Defendant's parents sent him to the Montana clinic, where he remained until Det. Witherow asked to take him into custody. Dr. Moore noted that the Defendant had told her about other sexual activities of his, including a one-night sexual encounter with a stranger he met online.

Regarding the Defendant's condition, Dr. Moore testified that pornography viewing can be indicative of intimacy deficits because pornography tends to objectify people. The Defendant's behavior showed a "sexual disorder of interest and action against prepubescent children." Dr. Moore performed a standardized test to determine the Defendant's risk of recidivism; it returned a "moderate low" result. Because the test took into account formal charges against the subject, and because the Defendant had never been charged in

Pennsylvania, however, Dr. Moore said that it might have underestimated the Defendant's risk of reoffending. Dr. Moore noted that the Defendant exhibited very little empathy for the victim in her interview with him. She also noted that the Defendant tended to blame his actions on pornography and had relatively little insight into his behavior.

On cross-examination, Dr. Moore agreed that the Defendant had been honest with her in disclosing his sexual activities with the victim and others. She also said his decision to report his own conduct in Tennessee could indicate that he recognized his problem and wanted to report it. She said that the Defendant's parents' previous attempts at treatment, including counseling and a safety plan, were not enough, and that the treatment the Defendant received in Montana did not address the Defendant's sexual deviancy in a sufficiently specific manner. While Dr. Moore did not offer an opinion regarding whether jail or probation would be preferable, she said that the Defendant's chances of reoffending would be much less with treatment, that he could be monitored if not incarcerated, and that his risk level was "not so high I would say he required an inpatient facility."

The Defendant called as a witness Dr. Allister Finlayson, a psychiatrist who had also evaluated him. After being qualified as an expert in the evaluation and treatment of sex offenders, Dr. Finlayson testified that he performed a psychosexual evaluation of the Defendant by gathering information on the Defendant and conducting a series of interviews, including numerous tests.

Dr. Finlayson diagnosed the Defendant with a sexual disorder and paraphilia involving incest. He did not diagnose the Defendant with pedophilia because sexual interest testing revealed that the Defendant was not specifically attracted to children, and in fact, performed relatively normally in the sense that his sexual interest focused on sexually mature adolescents of an age group similar to his own. Dr. Finlayson performed the same recidivism test given to the Defendant by Dr. Moore and received the same result: that the Defendant was a "moderate low" risk to reoffend.

Dr. Finlayson noted that the Defendant did not deny his offenses or attempt to minimize them, which Dr. Finlayson considered to be a "good start." The Defendant did not have very much empathy for the victim, however. Dr. Finlayson told the Defendant he needed intensive sex offender treatment; the Defendant originally said he was willing to get that treatment, but when encouraged to do more, he said he "wasn't really quite ready to make the change." The Defendant, for instance, went to some Sexaholics Anonymous ("SA") meetings but not nearly as many as he could have. Dr. Finlayson opined that the Defendant was unlikely to reoffend assuming he received the coercion necessary to enter intensive sex offender treatment. He also said the Defendant should be monitored.

The State called Wanda Daniels, foster mother of the victim and Ryan since March 19, 2008. She testified that the victim, who was eleven years old at the time of sentencing, had received some treatment but experienced continuing problems as a result of her abuse by the Defendant. She bullied peers at school, constantly belittled Ryan, and exhibited some inappropriate sexual conduct. Ms. Daniels noted that the victim's parents visited every other week, and that the victim wanted to see her father but did not like her mother.

The Defendant, twenty years old at the time of sentencing, also testified. He said that he and his siblings had been adopted at different times from India by his parents, who then lived in Pennsylvania. Before being adopted as a six-month-old, he had lived in Calcutta. The Defendant was twelve years old when his parents adopted the victim; he and his other siblings, Ryan, Katelyn, and Koli, had all been adopted before her. At the time, the Defendant was unsure why his parents kept adopting children, and he resented the victim's presence.

Around this time, the Defendant began to have "issues with sex"; he found his father's pornography collection and used it when masturbating. He also started to view pornography on the internet. He was very stressed because his parents were present so infrequently; when pornography became insufficient to relieve his stress, he abused the victim. He did not recognize at the time that his actions were wrong, but said at sentencing that he was being selfish and regretted his actions.

After a few months, the Defendant told his sister Koli that he had abused the victim. Koli told the Defendant's mother, who confronted the Defendant, told authorities, and separated him from the victim with a safety plan. He also began to see a counselor, although he did not receive counseling tailored to his sexual offense. The Defendant's counselor and his parents told him that his actions were wrong, but that did not have a significant impact on him at the time.

The Defendant continued to masturbate for the next few years, but viewed very little pornography. He entered Catholic school and became very active in the Boy Scouts; the structure imposed by these organizations helped him. He was able to become an Eagle Scout, the highest rank in the Boy Scout program and one attained by only about five percent of all Boy Scouts. He admitted, however, that he had consensual sex with another Boy Scout during this time.

The Defendant and his father moved to Tennessee in June 2007; the rest of the family joined them in August 2007, after the victim and Ryan had completed their school year. Over that summer, the Defendant "got bored." He had not seen a counselor in some time; he also did not know anyone in Tennessee and felt like an outcast.

He therefore relapsed and abused the victim again on three occasions. On the first occasion, he "dry-humped" the victim, while both were clothed, until he ejaculated. Before the second occasion, the Defendant had again been viewing pornography; he went to the victim and rubbed against her until he ejaculated into his clothes. On the third occasion, he removed both his pants and the victim's pants, rubbed against the victim, and briefly performed cunnilingus on her. He then directed her to bend over the toilet and tried to insert his penis into her vagina. Unable to do so, he rubbed his penis against her genitals until he ejaculated. The Defendant said he never used physical force on the victim.

The Defendant's parents were out of the house on each of these occasions. The Defendant felt guilt after the first and second occasions but could not stop; after the third time, however, he felt extremely guilty and told Ms. Skuba and his old counselor about his behavior.

The Defendant's mother and his counselor found the clinic in Montana and sent him there. He stayed for four months in a general addiction program. He learned that he had a problem, and learned to think of his little sister as the victim of his acts. On April 22, 2008, after the Defendant had hired an attorney, he returned to Tennessee and turned himself in to police. He was released on bond and began living with a friend. He saw Dr. Moore for an evaluation and continued to have therapy over the phone with Elisha Brea, a therapist he had seen in Montana.

He also hired Dr. Finlayson, who suggested attendance at SA meetings. The Defendant testified that he had been referring only to masturbation when he told Dr. Finlayson that he "wasn't really quite ready to make the change." The Defendant said that, at the time of sentencing, he did not have a computer and did not view pornography on the internet or elsewhere.

He said that he abused the victim because she was the first available female. He felt ashamed and said he should not have abused the victim. The Defendant requested treatment for the purpose of discerning the source of his sexual desires and how to avoid committing any further abusive acts. He said he had committed no illegal acts since being released on bond and was willing to submit to a curfew, GPS monitoring, polygraph exams, or any other conditions in order to avoid prison.

On cross-examination, the Defendant admitted that he attended SA sessions irregularly because they originally occurred at 6:30 a.m., which was "too early" for him. He also admitted that he directed the victim to perform fellatio on him in Pennsylvania and on the first occasion of abuse in Tennessee. He also made the victim watch pornography in Pennsylvania. He testified about other sex acts he had committed at various times, including

masturbating on webcam, meeting an anonymous forty-year-old man in a parking lot after a conversation with him on the internet, and sex with an anonymous woman met at a swimming pool. The victim testified at sentencing that he had abused the victim on three or four occasions in Pennsylvania, but acknowledged that he had told Dr. Moore he had done so ten times. He said he lied to Dr. Moore about the number because he was uncomfortable with her. The Defendant admitted to having occasional anger issues, and agreed that Ryan and the victim thought he was a bully.

The Defendant also presented the testimony of his older sister Katelyn and a Rite Aid coworker, Jamie Lester, with whom he had a romantic but non-sexua,l five-month relationship. Both described him as a loving, compassionate, and altruistic person, and expressed a desire that he receive treatment.

In addition to the testimony and exhibits mentioned above, the trial court considered letters of support for the Defendant, the Defendant's presentence report, the written evaluations prepared by Dr. Moore and Dr. Finlayson, and a scholarly article on the treatment of sex offenders. After its review, the trial court ordered the Defendant to serve his full sentence in confinement. He now appeals.

**Analysis**

The Defendant contends that the trial court erred in failing to sentence him to a period of split confinement. The presentence report in this case indicates that the Defendant, at the time of sentencing, was a twenty-year-old male with no prior criminal record. He received a high school degree from Bishop Hafey High School in Hazleton, Pennsylvania, and briefly attended Volunteer State Community College in Gallatin before dropping out to attend the treatment program in Montana. He reported fair physical health and good mental health at the time of sentencing, but noted that he took medication for ADHD. The Defendant worked as a lifeguard and an Eckard's Drug Store cashier while in high school; upon moving to Tennessee, he worked at a Rite Aid Drug Store from June 2007 to January 2008 and from April 2008 to the time of sentencing.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also

State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008).  If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness.  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing.  Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

Effective June 7, 2005, our legislature amended Tennessee Code Annotated section 40-35-102(6) by deleting the statutory presumption that a defendant who is convicted of a Class C, D, or E felony, as a mitigated or standard offender, is a favorable candidate for alternative sentencing.  Our sentencing law now provides that a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, *should* be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary.  A court shall consider, but is not bound by, this advisory sentencing guideline." Tenn. Code Ann. § 40-35-102(5), (6) (emphasis added).  No longer is any defendant entitled to a presumption that he or she is a favorable candidate for alternative sentencing.  Carter, 254 S.W.3d  at 347.

The following considerations provide guidance regarding what constitutes "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

    (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1); see also Carter, 254 S.W.3d at 347. Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(2), (4). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. Tenn. Code Ann. § 40-35-103(5).

In rendering judgment in this case, the trial court noted that it considered the Defendant's presentence report, medical reports, and letters of support. It also considered the principles of sentencing, the Defendant's and State's arguments, the nature of the Defendant's conduct, and his potential for rehabilitation.

Although it noted that the Defendant had no criminal record other than his abuse of the victim, the trial court considered it important that this abuse continued even after the Defendant had been exposed to the structure of a Catholic school and the Boy Scouts. The trial court also noted that the Defendant did not attend SA meetings as frequently as Dr. Finlayson had directed him to and that his overall activities revealed a broad sexual deviancy.

The trial court opined that the Defendant showed little genuine remorse for his conduct or empathy for the victim, and refused to acknowledge any selfish interest in sexually deviant behavior, instead blaming boredom and depression for his actions. The trial court also opined that the Defendant seemed motivated to seek treatment primarily in order to avoid incarceration. The trial court noted that, at sentencing, the Defendant contradicted Dr. Moore's report by denying that he abused the victim ten times in Pennsylvania and denying that he verbally intimidated the victim.

Regarding the seriousness of the offenses at issue, the trial court noted that the Defendant's actions permanently and severely damaged both his family and the victim's mental health, and opined that only murder is a more serious crime than rape of a child. Regarding the dictates of Tennessee Code Annotated section 40-35-103, the trial court found that a denial of split confinement was necessary to provide a deterrent to others and to avoid depreciating the seriousness of the Defendant's offenses, and that the Defendant still posed a risk to society. The trial court evidently concluded that the Defendant would be most amenable to treatment in incarceration, as the Defendant's judgment forms order his transfer to the sex offender treatment program at the Deberry Special Needs Facility "as soon as possible."

The Defendant's argument on appeal largely criticizes the trial court's application, or lack thereof, of certain mitigating and enhancement factors, set forth in Tennessee Code Annotated sections 40-35-113 and -114. In its ruling, the trial court made some comments that would support the finding of certain mitigating factors: It noted that the Defendant has a history of mental health problems. See Tenn. Code Ann. § 40-35-113(8). It did not explicitly apply any enhancement factors. In deciding a sentence's manner of service as opposed to its length, a trial court is only required to consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114," which the trial court did. Tenn. Code Ann. § 40-35-210(b)(5) (see also State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996)) (noting that a court "*may* also apply" those mitigating and enhancement factors (emphasis added)). The trial court was therefore not, as the Defendant suggests, required to specifically consider as a mitigating factor his youthful lack of judgment under Tennessee Code Annotated section 40-35-114(6).

The trial court's ruling on whether the Defendant should be granted split confinement is primarily governed by Tennessee Code Annotated section 40-35-103. After our review, we conclude that the trial court properly considered this section, as well as all other sentencing principles applicable to this case, and found that a sentence of confinement was necessary for deterrence, to avoid depreciating the seriousness of the Defendant's offenses, and because the Defendant was not sufficiently amenable to treatment outside of confinement and was therefore likely to reoffend.

As to the seriousness of his offenses, the Defendant contends on appeal that "there was no medical evidence presented on what, if any, effect this abuse has had on [the victim]." There was, however, non-medical evidence presented in the form of testimony by the victim's foster mother. Regarding his risk to society, the Defendant notes Dr. Moore's and Dr. Finlayson's assessments that he presented a "moderate low" risk to reoffend if he received sex offender-specific treatment; we cannot conclude that the trial court erred in its evident decision that the Defendant was a risk to reoffend while receiving treatment out of confinement, however.

After our review we conclude that the trial court properly considered all applicable principles of sentencing and find no error in its decision that the Defendant failed to provide sufficient evidence that he was a favorable candidate for alternative sentencing.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
DAVID H. WELLES, JUDGE