# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 5, 2009

## STATE OF TENNESSEE v. QUIDON CLEMONS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-00103     W. Mark Ward, Judge**

---

**No. W2008-02216-CCA-R3-CD - Filed June 30, 2010**

---

Following a jury trial, Defendant, Quidon Clemons, was convicted of assault, a Class A misdemeanor, aggravated stalking, a Class E felony, and violation of an order of protection, a Class A misdemeanor. The trial court sentenced Defendant as a Range I, standard offender, to two years for aggravated stalking. As to the misdemeanors, Defendant was sentenced to eleven months, twenty-nine days for assault, and eleven months, twenty-nine days for violation of an order of protection. The sentences were ordered to be served consecutively. On appeal, Defendant argues that his sentence is excessive. After a thorough review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which J. C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Harry E. Sayle, III, (on appeal), Memphis, Tennessee; and Constance Barnes, Assistant Public Defender (at trial), Memphis, Tennessee, for the appellant, Quidon Clemons.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman, Assistant District Attorney General; for the Appellee, the State of Tennessee.

OPINION

## I. Background

*Trial*

The victim, Earnestine Jones, and Defendant dated for approximately one and one-half years before she ended the relationship in 2005. At the time, she and her son were living in the Foote Homes in Memphis, Tennessee. The victim testified that the break-up was friendly at first, but it later turned bitter when Defendant realized that they would not be together. She said that he would call begging to be with her. After a couple of months passed, Defendant called daily threatening to kill her. The victim testified that during that time, she stayed at her mother's house and did not go home. She called police "at least three or four times a week for about eight, nine months." The victim obtained an order of protection against Defendant in November of 2006. The judge ordered Defendant to stay away from the victim, but he did not abide by the order.

The victim testified that she obtained a second order of protection against Defendant because his conduct became worse. She said that he was still threatening her and showing up at her house. If the victim drove by her home and saw Defendant there, she would continue driving until she reached her mother's house. The victim said that Defendant showed up at her mother's house and left notes on the door and on her car. He also called her place of employment.

At some point, the victim began dating Randall Baymon. She said that Defendant would show up at her apartment and bang on the door. This occurred "[e]very other day or so," and while Mr. Baymon was there. The victim testified that she would ask Mr. Baymon to follow her home and watch out for Defendant. On July 7, 2007, the victim was walking Mr. Baymon to his car when she encountered Defendant. She became scared and turned to go back inside the apartment. She said that Mr. Baymon and Defendant had words, and she saw Mr. Baymon back up with his hands up. Mr. Baymon then got into his car and drove around the corner. When Defendant turned around, the victim saw a gun in his waistband. She said that a guy was "bear hugging" Defendant to prevent him from shooting her. The victim testified that she went into the apartment and locked the door. Mr. Baymon called her a few seconds later. Defendant then yelled that he was going to shoot up the residence and kick in the door. The victim called police and hid inside apartment. Defendant was gone when officers arrived. The victim talked to police and later gave a statement. She also told them that on the previous day, someone had broken five windows out of her car. She allowed the detective to hear a phone message that Defendant had left her about the busted

windows. The victim testified that in the message, Defendant taunted her about her car getting wet and that she would be "broke" paying for all of the windows.

Randall Baymon testified that he and the victim dated for about five months in 2007. While they were dating, Defendant would bang on the victim's door, and there were instances when Defendant would be waiting on the porch when they arrived at the victim's home from the "movies or anything." Defendant also left the victim threatening messages. The victim told Mr. Baymon that she had two restraining orders on Defendant. On one occasion, the victim called Mr. Baymon because defendant had left a message threatening to kill her, and she was afraid to go home. Mr. Baymon then met her after work and followed her home. When they arrived, Defendant was waiting for her on the porch. Mr. Baymon approached Defendant who said that the victim owed him money for some accessories that he had given her while they were dating. During this time, the victim sat in her car crying and shaking.

Mr. Baymon testified that on July 6, 2007, Defendant left a message on the victim's voice mail "saying that some kids was throwing rocks at her car, they was busting out her windshields and all types of things like that." When he took the victim home the next day on July 7, 2007, the windows were busted out of her car. After the victim vacuumed the glass out of her car, Mr. Baymon left to play basketball. As Mr. Baymon was leaving, Defendant and another man walked by. Defendant then said that "somebody is going to get their ass blowed off." Defendant pulled up his shirt and revealed a pistol. Mr. Baymon testified that the man with Defendant told Defendant not to shoot and prevented him from pulling the gun. Mr. Baymon backed away toward his car, and at some point, called the victim and told her not to go outside because Defendant was armed. As Mr. Baymon drove away to get his gun, it appeared that Defendant and the victim were at her door arguing. Mr. Baymon testified that the victim called him before he got back to her apartment with the gun and told him that police were looking for Defendant. Mr. Baymon said that he and the victim eventually split up because of all the "drama."

Mike Triplett is employed by the General Sessions Court Clerk's Office, and it is his responsibility to maintain records. He testified that an order of protection for the victim was granted against Defendant on November 7, 2006. Defendant was ordered to "refrain from telephone contacting or otherwise communicating with the [victim] directly or indirectly or coming about [victim] or [victim's] residence or place of employment for any purpose." Defendant was also prohibited from having a firearm or ammunition.

Officer Brian Rickett of the Memphis Police Department was assigned to the Foote and Clayborn Homes on July 7, 2007, and he responded to a domestic call concerning an armed individual at the victim's residence. He drove to the scene and spoke with the victim

and took a report. Officer Rickett estimated that there was two minutes between the time that he got the call and when he arrived on the scene. He testified that the victim was "frightened, upset, visibly shaken, and concerned." She told him that Defendant had a pistol threatening to shoot her. Officer Rickett testified that he talked to the victim about getting a restraining order and staying with someone for a day or two. He was unable to locate Defendant.

Defendant testified that he and the victim were in a steady relationship for about two years. At the time, he was also dating the mother of his child who lived in the Foote Homes near the victim. The child was born in March of 2007, and Defendant said that he visited her daily. Defendant testified that the victim found out about his other girlfriend and confronted him at his mother's home. He said that the victim was not seeing anyone else while they were dating.

Defendant testified that a restraining order was issued against him in November of 2006 , and he read it and understood that he was to have no contact with the victim. He claimed that he stopped calling her, but she continued to contact him, and she showed up at his mother's home. Defendant testified that his relationship with the victim was "on and off" until June 19, 2007, when he decided to be with his child's mother, and he left for the Job Corps. He said that he never threatened to kill the victim, and he never threatened her or Mr. Baymon with a gun. Defendant testified that on July 7, 2007, the victim and Mr. Baymon stopped him at a store and questioned him about some car windows, which he denied knowing anything about. He said that they had previously stopped by his mother's house looking for him. Defendant testified that he turned himself in on August 14, 2007, after learning that there was a warrant for his arrest.

*Sentencing Hearing*

At the sentencing hearing, Defendant's sister, Joanne Isom, testified that Defendant dated the victim until he went into the Job Corps around June 15, 2007. She had witnessed several incidents between Defendant and the victim. Ms. Isom testified that in the Spring of 2007, the victim showed up at her  mother's home while Defendant was there with his girlfriend and "busted" into his room. She said that the victim was "hooping and hollering" and refused to leave, so Ms. Isom said that she called the police and had the victim escorted off the property. Ms. Isom was aware that the victim filed for an order of protection against Defendant. She said that after the order was filed, the victim called Defendant and begged him to come back to her. Ms. Isom testified that Defendant moved back in with the victim the following week and lived with her for approximately three months. She said that Defendant is a good and honest person, and he needed to be home to take care of his child.

On cross-examination, Ms. Isom testified that she did not appear at Defendant's trial as scheduled because she has three children and needed to work. She was aware that Defendant was convicted of a weapons offense in January of 2007; however, she testified that he did not carry guns with him. Ms. Isom was also aware that Defendant had a previous conviction for domestic violence, and as a juvenile, he was convicted of aggravated assault and carrying a weapon on school property. She testified that on the night of the offense, the victim invited Defendant to her house.

Defendant testified that if released on probation, he planned to return to the Job Corps Administration in Bristol, Tennessee where he had previously trained for a Commercial Drivers License (CDL) and had been studying for his GED. Defendant said that the program lasts for approximately one year, and he already had "about a month or two months." He left the Job Corps because he found out about the warrant in this case, and his counselor told him to come back when he was released. Defendant testified that he had completed six months of anger management and three months of life skills classes. He was working as a trustee in the "J-pod" of the jail annex. Defendant said that he went to trial in this case because he did not commit the crimes.

On cross-examination, Defendant testified that the only wrong he committed was treating the victim "wrong" and cheating on her. He said that his January 2007 weapon and criminal trespass offenses occurred because the victim set him up by placing a knife in his bag. Defendant said that he pled guilty to the offenses because the State offered him time served, and he did not want to waste time fighting the charges. He admitted that he violated bail conditions by not staying away from the victim. Concerning his domestic violence conviction in November of 2006, Defendant claimed that the victim again fabricated the charge, and he pled guilty because the State offered him time served. He said that as a juvenile, he was carrying a knife on school property because he "got jumped by two dudes when [he] was in the fifth grade." Defendant testified that he was charged with aggravated assault because he had the knife, not because he threatened anyone with it. He admitted that he also had juvenile convictions for theft, disorderly conduct, and assault. The assault was against his older sister. Defendant testified that his sister who testified at the sentencing hearing was mixed up when she said that the offense in this case occurred at the victim's residence. He said that the altercation with the victim and her boyfriend occurred at the store, and the victim later called him to her house, and he went to the residence with his sister. Defendant claimed that he did not have a weapon at the time.

Concerning Defendant's conviction as a juvenile for aggravated assault, the trial court noted:

This case back in 1998 in Juvenile Court involved aggravated assault. According to this, it says - - this is part of the presentence report from Juvenile Court. On September 17, 1998, Quidon Dewayne Clemons was taken into custody and charged with aggravated assault and carrying a weapon on school campus. Quidon is not a student at Georgia Avenue School, but was on their campus with a knife. He was accused of pulling the knife on victim Arthur Johnson and stating, "I'm going to get my sister and then I'm going to cut you." According to Quidon, he had brought the knife to school because Arthur had jumped on him the day before. Quidon admitted to the charge. He stated that Arthur had tried to jump on him and he was to use the knife for protection. His mother stated she has problems getting Quidon to follow her rules.

## II. Standard of Review

Defendant was convicted of aggravated stalking, a Class E felony, assault, a Class A misdemeanor, and violation of an order of protection, a Class A misdemeanor. The trial court applied the following enhancement factors: the Defendant has a previous history of criminal convictions or criminal behavior; the offense involved more than one victim, the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense, and the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. T.C.A. § 40-35-114(1), (3), (9), and (16). The court found no mitigating factors that applied in this case. Based on the presence of four enhancement factors the trial court sentenced Defendant, as a Range One, standard offender, to two years for aggravated stalking conviction. As to the misdemeanors, the trial court sentenced Defendant to eleven months and twenty -nine days for assault, and eleven months twenty-nine days for violation of an order of protection. All three counts were ordered to be served consecutively.

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id.*

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the

parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the Defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

In this case, Defendant argues that his sentence is excessive because the trial court incorrectly applied two enhancement factors: the offense involved more than one victim, and the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id*. at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

The record reflects that the trial court considered the evidence presented at the suppression hearing, the trial, and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing

alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment.

First, the State concedes on appeal, and we agree, that the trial court misapplied enhancement factor (3), that the felony offense involved more than one victim. Defendant in this case was convicted of committing assault against a specific, named victim. The Tennessee Supreme Court has held that there cannot be multiple victims for any one offense where the indictment specifies a single named victim. *Imfeld*, 70 S.W.3d at 706. The Court also noted: "The statutory language of the 'multiple victims' factor, however, limits its application to 'an offense' involving 'more than one (1) victim.'" *Id*. (quoting T.C.A. § 40-35-114(3)).

Defendant contends that the trial court erred in applying factor (9), that he possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. He asserts that by convicting him of assault rather than the greater offense of aggravated assault, the jury found that he did not possess a weapon during the commission of the offenses. He further notes that he "emphatically and repeatedly" denied that a weapon was involved. In considering Defendant's use of a firearm during the commission of the assault, the trial court noted:

> I will say this, on the assault charge the jury returned a verdict on a lesser included offense. He was charged with aggravated assault by virtue of a firearm being also used, and I assume the jury found beyond a reasonable doubt that a firearm had not been proven. I do find - - I listened to the evidence. I do find by a preponderance of the evidence that the firearm was there, and I do believe that the defendant committed an aggravated assault, an offense greater than that for which he was found guilty of. I'm taking that into consideration.

The Tennessee Supreme Court has held that when considering an enhancement factor, the trial court may apply the factor based on facts underlying an offense for which the defendant has been acquitted at trial. *State v. Winfield*, 23 S.W.3d 279, 284 (Tenn. 2000). At trial, both the victim and Mr. Baymon testified that they saw a gun in Defendant's waistband and that another man was "bear hugging" Defendant to prevent him from shooting. The trial court obviously accredited the testimony of the two witnesses. As noted by the Court in *Winfield*: "The trial court heard the testimony and viewed the witnesses and is in a superior position to an appellate court to make such findings in a case where there is conflicting evidence regarding the existence of an enhancement factor." *Id*. Therefore, the trial court properly applied enhancement factor (9).

Even though the trial court misapplied enhancement factor (3), this does not require that Defendant's sentence be reduced. The three remaining factors: the defendant has a previous history of criminal convictions or criminal behavior; the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense, and the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult fully support the sentence imposed by the trial court. T.C.A. § 40-35-114(1), (9), and (16). In addition to the use of a weapon during the commission of the offenses, the presentence report reflects that Defendant has prior convictions for a weapons offense, criminal trespass, domestic violence, and he previously violated a condition of bail. The record also shows that Defendant had an adjudication as a juvenile for aggravated assault, a Class C felony.

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the three applicable enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of two years for aggravated stalking, eleven months and twenty -nine days for assault, and eleven months twenty-nine days for violation of a protective order. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE