IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. JASON EVERETT NICKELL

**Appeal from the Circuit Court of Madison County**
**No. 11-393    Roger A. Page, Judge**

**No. W2011-02155-CCA-R3-CD  - Filed November 9, 2012**

Jason Everett Nickell ("the Defendant") pleaded guilty to three counts of misdemeanor stalking, with no agreement as to his sentences.  After a hearing, the trial court sentenced him to eleven months, twenty-nine days at seventy-five percent on each count, to be served consecutively.  On appeal, the Defendant argues that his sentence is excessive because the trial court did not consider two mitigating factors.  After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

George Morton Googe, District Public Defender (on appeal), and Paul E. Meyers, Assistant Public Defender (at plea and sentencing hearings), Jackson, Tennessee, for the appellant, Jason Everett Nickell.

Robert E. Cooper, Jr., Attorney General & Reporter; Sophia S. Lee, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Benjamin C. Mayo, Assistant District Attorney, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

The Defendant was indicted on July 5, 2011, for three counts of misdemeanor stalking in violation of Tennessee Code Annotated section 39-17-315 (2010).  His charges arose out of several incidents which occurred in March and April of 2011, involving three victims:

Miracle Morman, Hollie Garland, and Laura Ferkaluk. He pleaded guilty to the misdemeanor offenses on November 2, 2011, leaving the sentence on each conviction to be determined by the trial court. Following a sentencing hearing, the trial court sentenced the Defendant to eleven months, twenty-nine days at seventy-five percent on each count, to be served consecutively. The Defendant timely appealed his sentence, arguing that the trial court erred in not considering two mitigating factors which were submitted to the court: remorse and admission of guilt. Thus, the Defendant asserts, this Court should "modify and reduce the sentence."

At the sentencing hearing, the presentence report was admitted as an exhibit, and it is included in the record before us.[1] Additionally, the prosecutor introduced certified copies of judgments from West Virginia, sentencing and plea agreements from West Virginia, and probation revocation orders from Texas. These documents were admitted as exhibits.[2] This proof established that the Defendant's prior record included at least the following: two convictions for "indecency with a child third degree" from Texas;[3] felony convictions from West Virginia including one conviction for failure to register as a sex offender,[4] one

---

[1] The only objection defense counsel made to the admission of the presentence report was to charges or arrests listed in the "comments" section on page eight which do not state the disposition. Defense counsel asked that this portion of the presentence report be stricken, and the trial court granted his request.

[2] Defense counsel objected to the admission of documents contained in exhibit five and collective exhibit eight. Exhibit five pertains to a conviction for indecent exposure from West Virginia. Defense counsel objected to the admission of the affidavit of complaint and the plea agreement. Although the trial court did not rule on the objection, it only allowed a certified copy of the judgment to be admitted. Collective exhibit eight pertains to a conviction for failure to register as a sexual offender and it includes the following: an amended sentencing order, a sentencing order, a petition to revoke bond, an order revoking bond, a plea order, a plea agreement, and an indictment. Defense counsel objected, stating that "we're just getting into hearsay, anything besides the judgment." The trial court ruled that it would only consider the judgment portion of this exhibit.

[3] The Defendant was sentenced to "ten (10) years Texas Department of Criminal Justice Institutional Division (probated)." The Defendant's probation for these offenses later was revoked, and he was ordered to serve five years in actual confinement.

[4] The Defendant was sentenced "to an indeterminate sentence of one (1) to five (5) years in the West Virginia State penitentiary."

conviction for attempted kidnapping;[5] several misdemeanor convictions from West Virginia,[6] including two convictions for indecent exposure, one conviction for simple assault, one conviction for evading arrest, and one conviction for driving on a revoked license; and one conviction for attempt to violate the sex offender registry from Tennessee.

At the sentencing hearing, Miracle Morman, one of the victims named in the indictment, testified that her first encounter with the Defendant occurred at the Jackson mall. Inside the mall, the Defendant approached Morman and complimented her on how pretty she looked. Thereafter, Morman saw the Defendant several other times in the mall that day, causing her to feel uncomfortable, so she decided to leave the mall. As she was leaving the mall, Morman saw the Defendant behind her again, "like he was about to go out the door, too." She wanted him to exit the mall before she did, so she entered another store to let him leave first. When Morman left the store, the Defendant was still in the lobby "looking kind of suspicious," but she exited the mall anyway.

The following day as Morman was walking towards Kohl's, the Defendant approached her in his vehicle. The Defendant, again, complimented Morman on how pretty she looked, causing her to feel uncomfortable. Morman continued on her way to Kohl's. She stated, "I shopped for a while and when I came out he approached me again [in his vehicle] like he was waiting on me to exit the store." The Defendant told Morman "that he had a fetish with [her]" and asked her if she could "stand there and let him look at [her] for a while." According to Morman, the Defendant was looking at her "sexually" while he said this to her, and he also "made a comment about [her] breasts." Morman explained that there was no way for her to get away from the Defendant because she was walking and he was driving in his vehicle, so she began walking towards Ross, a nearby store. As she walked towards Ross, the Defendant drove behind her. Morman stated that the Defendant then "pulled up beside me. And when he pulled up beside me, he was in his car masturbating. And then I ran into the store and I didn't come out." When Morman returned home after this incident, she called police and gave a statement.

Hollie Garland, another victim named in the indictment, testified at the sentencing hearing that her first encounter with the Defendant occurred at Target. Garland first noticed the Defendant because he was driving "really slow" beside her and her friend. She explained that "he was staring intently at us as we were walking in." Garland and her friend went

---

[5] The Defendant was sentenced "for an indeterminate period of not less than One (1) year nor more than Five (5) years." His sentence was suspended, and he was "placed on probation for a period of Five (5) years." The Defendant's probation subsequently was revoked.

[6] We characterize these convictions as misdemeanors because the sentence imposed for each conviction was eleven months, twenty-nine days or less.

inside Target and shopped for approximately ten or fifteen minutes, but the Defendant was still in the parking lot when they exited. Garland stated that they saw his vehicle "coming towards us again, so we were scared." Thus, Garland and her friend walked to her car quickly. Garland then noticed the Defendant "waiting at the end of an aisle as if like to see me leave. . . . [S]o I took a different way out the back of Target and went back to Union."

Garland encountered the Defendant again several days later. On this occasion, Garland had parked her car on Union University[7] campus and was getting out of it when, according to her, the Defendant "pulled up in a different vehicle right behind my car, like blocked my car and like I couldn't have moved it if I wanted to." The Defendant told Garland how stunning she was, and then he asked her about her major, what she was studying at Union, how tall she was, and other personal questions. When Garland began to realize that he was the same individual from Target, she "became very scared and . . . knew that that was not right." The Defendant next asked Garland if she knew what a fetish was, to which she responded that she did. The Defendant then asked, "So if I asked you if I could look at your feet would you let me?" Garland told the Defendant "no" and that she needed to go. The Defendant then "sped off rather quickly." Subsequently, Garland called Union campus security and filed a report the same day.

Officer Mark Headin[8] of the City of Jackson Sex Offender Registry Compliance Unit testified at the sentencing hearing that Union campus security was able to get a tag number from the Defendant's vehicle, which came back as registered to the Defendant and his wife. Union campus security also determined that the Defendant is a registered sex offender. Officer Headin became involved in this case because this information was forwarded to him "to follow up on."

Officer Headin initially was not aware that there were two other victims besides Garland, Miracle Morman and Laura Ferkaluk. However, during the course of his investigation, Officer Headin discussed the facts of the case involving victim Garland with Lieutenant Tyreece Miller, and Lt. Miller informed him that those facts sounded similar to another stalking case that Investigator Cole currently was working on, which involved victim Morman. Officer Headin then conferred with Investigator Cole, and the two of them determined that both cases probably involved the Defendant. Because the Defendant was a registered sex offender, Officer Headin was able to access a photograph of him. Officer

---

[7] Garland referred to this as "Union campus" or "Union" throughout her testimony. We assume, however, that "Union" is Union University located in Jackson, Tennessee.

[8] Mark Headin's last name is spelled "Heddin" in the sentencing transcript. However, on the state warrant pertaining to victim Garland and on the indictment in this case, his last name is spelled "Headin."

Headin then compiled a photographic lineup to present to Morman, and she positively identified the Defendant as the person that approached her at the mall and at Kohl's.

Officer Headin further testified that Lt. Miller "put out a press release, and during the course of the press release we issued a photograph and with – anyone having contact or any more information regarding this case to contact the Jackson Police Department." Subsequently, Laura Ferkaluk contacted Officer Headin. She was another Union student who "had contact with Mr. Nickell." As a result, Officer Headin "charged him by indictment" for a third count of misdemeanor stalking, naming Laura Ferkaluk as the victim.

The Defendant testified at the sentencing hearing and admitted that he has "a problem." He stated that his "problem" started because of his first marriage. The Defendant and his first wife were both in the Army. According to the Defendant, when he came "back from a mission . . . she had admitted that she had had an abortion because she didn't want to hurt her military career." The Defendant then stated,

> And it – I don't – I don't know what flipped on me, but I started turning towards, you know, the – basically the, you know – the incidents that would – that had caused me to be in trouble with this – this fear of – of being with someone and having them be pregnant and do the same thing and just – I – I don't know what – what I was thinking. It was obviously stupid.

At the time of the sentencing hearing, the Defendant had been married to his current wife for four years. In this regard, the Defendant stated,

> I straightened up my life, I had met her, started going to her church, and actually worked my way up in the ministry to the parts where I was actually an evangelist and was an elder of the church and was being called to several churches.

Nevertheless, the Defendant admitted that "[r]egardless of what happens here I do need to try to speak to a professional to find out why I slipped now after working so hard."

The Defendant also testified, "I've been willing to take responsibility for my actions, you know. . . . And what I [have] done is inexcusable. And I'm willing to be responsible for my actions. And that's all I've ever tried to do." He also said that he did not mean to cause harm to the victims. When asked whether he was sorry for what he did, the Defendant stated, "[t]he fact that I have – I have alarmed them so that – that's put us here today, yes." The Defendant also said,

I honestly don't think I – I honestly don't think I was thinking. That's part of the reason why I – I want to try to find out.

I mean, I – I can't , you know, do time and go out and do nothing about it. I want to try to do something about it so I can help make sure this doesn't happen again.

On cross-examination, the Defendant admitted that he "went to counseling in Texas with the first offense" and that it was not by court order. He also went to counseling in West Virginia, but he did not complete it.

The Defendant explained some of his prior record, admitting that he is on "the registry" for his "indecent exposure charge." He stated, however, that he has no sexual convictions involving offenses for which he actually had contact with the victim. With regard to the simple assault conviction, the Defendant stated there "was no injury" and that he was not charged with a sexual offense in that instance. With regard to the Defendant's attempt to violate the sex offender registry conviction, he stated that it "was an attempt due to the fact that I had not signed one of the papers he [sic] was supposed to send to the TBI. And I – I was working. I overlooked it." He explained that he "agreed to the sentencing" for that offense. With regard to the Defendant's attempted kidnapping conviction, he explained,

It was an argument. I had yelled. I was angry. At no time did I even come near the person who had said that I attempted to kidnap him. However, with their word against mine I had no say and I just said, "Fine, I'll plead guilty." They gave me probation.

With regard to the Defendant's revocation of probation for his attempted kidnapping conviction, as well as his failure to register as a sex offender conviction, the following exchange occurred between the Defendant and the State immediately following the previous statement by the Defendant:

Defendant: With the fail to register was the – was in that same area was a fact that I had a cell phone with prepaid minutes that ran out of minutes. I was charged, convicted, and they violated the probation to run it concurrent with the violation order.

State: So you got probation for the attempted kidnapping and then you violated probation and had to serve that sentence?

Defendant:  Well, I asked them to violate it to run it concurrent with the –
with the prison sentence of the violation of – of failed to
register.

At the conclusion of the proof at the sentencing hearing, the trial court sentenced the
Defendant to eleven months, twenty-nine days on each count. The trial court ordered that
the Defendant serve "the maximum percentage that can be applied in this type of
misdemeanor," seventy-five percent, and the trial court ordered that each count run
consecutively based upon the Defendant's extensive criminal record. The Defendant now
argues on appeal that his sentence is excessive.

## Analysis

### Omission of Guilty Plea Transcript

We first note that the Defendant failed to include a transcript of the guilty plea
hearing. It is the Defendant's duty to compile a complete record for appeal. See Tenn. R.
App. P. 24(b). Disagreement exists among previous panels of this Court over whether, on
appellate review, we should presume the correctness of the trial court's sentencing
determination in the absence of the guilty plea transcript in the record. Some panels have
determined that this Court should address the merits of the sentencing determination if a
thorough review is possible without the transcript. See, e.g., State v. Monica Rankin, No.
M2011-01849-CCA-R3-CD, 2012 WL 3255087, at *7 (Tenn. Crim. App. Aug. 9, 2012)
(concluding that "the record is sufficient to afford appellate review" despite the defendant's
failure to include a transcript of the guilty plea hearing); State v. Anna M. Steward, No.
E2010-01918-CCA-R3-CD, 2011 WL 4346659, at *2 (Tenn. Crim. App. Sept. 19, 2011)
("Despite the absence in the appellate record of a transcript of the plea submission hearing,
we hold that the record is adequate for this court's de novo review . . . ."). Other panels have
concluded that an appellant waives the right to a full review of the trial court's sentencing
determination by failing to include the guilty plea transcript in the appellate record. See, e.g.,
State v. Darren Allan Vincent, No. M2010-02468-CCA-R3-CD, 2012 WL 187347, at *2
(Tenn. Crim. App. Jan. 20, 2012) (concluding that failure to include a transcript of the guilty
plea hearing "precludes a de novo review of his sentence and requires this court to presume
that the evidence supported the sentence"); State v. Christine Caudle, No. M2010-01172-
CCA-R3-CD, 2011 WL 6152286, at *4 (Tenn. Crim. App. Dec. 8, 2011) perm. to app.
granted (Tenn. April 12, 2012) (concluding that failure to include a transcript of the guilty
plea hearing "precludes a de novo review of her sentences and requires this court to presume
that the evidence supported the sentences").

While inclusion of the guilty plea transcript is preferred, based upon the specific facts of this case, we conclude that the record is sufficient to afford appellate review of the Defendant's sentence without the inclusion of the transcript of the guilty plea hearing. Additionally, as indicated above, the facts underlying the Defendant's guilty plea were adduced during the sentencing hearing.

**Standard of Review**

On appeal, the applicable standard of review of a challenged sentence is abuse of discretion with a presumption of reasonableness. State v. Susan Renee Bise, __ S.W.3d __, __, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012).[9] The presumption of reasonableness is granted to sentences that are within the authorized term for the misdemeanor and which reflect a "proper application of the purposes and principles of our Sentencing Act." Id. Moreover, if the sentence is within the appropriate term for the misdemeanor and the sentence is otherwise in compliance with the purposes and principles listed by statute, see id., we may not disturb the sentence even if we had preferred a different result, see State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. (2010); see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

*Sentencing*

The Defendant claims that the trial court erred in sentencing him because it did not consider the mitigating factors of remorse and admission of guilt. See Tenn. Code Ann. § 40-35-113(13) (2010) ("[a]ny other factor consistent with the purposes of this chapter"). Thus, the Defendant asserts, this Court should "reduce the amount of the sentence the Defendant is required to serve."

First, a defendant convicted of a misdemeanor may have, but is not entitled to, a separate sentencing hearing. Tenn. Code Ann. § 40-35-302(a) (2010). The trial court must, however, impose a specific sentence in terms of the months, days, or hours to be served. See Tenn. Code Ann. § 40-35-302(b) (2010). The court shall impose the sentence in accordance with the purposes and principles of the Tennessee Criminal Sentencing Reform Act ("the Sentencing Act"). Id. A person convicted of a misdemeanor is not entitled to the presumption of a minimum sentence. Johnson, 15 S.W.3d at 518.

---

[9] Although Bise involved sentencing for felony offenses, we conclude that the Tennessee Supreme Court would apply the same analytical framework to misdemeanor sentencing.

The trial court shall then determine a percentage of the sentence to be served in actual confinement by the defendant, and it shall do so in a manner that is not arbitrary. Tenn. Code Ann. § 40-35-302(d) (2010). In that determination, the court must consider enhancement and mitigating factors, as well as the legislative purposes and principles related to sentencing. See id. The trial court is not required to make findings on the record when fixing a percentage of a defendant's sentence to be served in actual confinement. See State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998) ("[W]hile the better practice is to make findings on the record when fixing a percentage of a defendant's sentence to be served in incarceration, a trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute."). The maximum percentage of a misdemeanor sentence that may be served in actual confinement before the defendant is eligible for consideration for rehabilitative programs is seventy-five percent. See Tenn. Code Ann. § 40-35-302(d).

In this case, the Defendant pled guilty to three counts of stalking, Class A misdemeanors,[10] punishable by no more than eleven months, twenty-nine days. See Tenn. Code Ann. § 40-35-111(e)(1) (2010) ("The authorized terms of imprisonment . . . for misdemeanors are . . . Class A misdemeanor, not greater than eleven (11) months, twenty-nine (29) days . . . ."). The trial court's sentence of eleven months, twenty-nine days on each count, therefore, is within the authorized term for a Class A misdemeanor.

Next, the trial court determined that the percentage of the sentence the Defendant shall serve in actual confinement before he is eligible for consideration for rehabilitative programs is seventy-five percent. In making this determination, the trial court must consider enhancement and mitigating factors, as well as the purposes and principles related to sentencing. Tenn. Code Ann. § 40-35-302(d).

The trial court determined that the following two enhancement factors were established by the proof submitted at the sentencing hearing: the Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and the Defendant has failed to comply with conditions of a sentence involving release into the community. See Tenn. Code Ann. § 40-35-114(1), (8) (2010). The trial court's findings are supported by the record. As set forth above, the presentence report, as well as the exhibits admitted at the sentencing hearing, reflect that the Defendant has an extensive history of criminal convictions. Additionally, the record reflects that the Defendant's prior probationary periods have been revoked at least twice.

---

[10] See Tenn. Code Ann. § 39-17-315(b)(2) (2010).

The trial court also determined that one mitigating factor was established by the proof submitted at the sentencing hearing: the Defendant's conduct neither caused nor threatened serious bodily harm. See Tenn. Code Ann. § 40-35-113(1) (2010). This mitigating factor is supported by the testimony adduced at the sentencing hearing. With regard to the mitigating factors of remorse and admission of guilt, although the trial court did not specifically articulate on the record that these two factors did not apply to mitigate the Defendant's sentence, the trial court does not have to make findings on the record when fixing a percentage of a defendant's sentence to be served in incarceration. See Troutman, 979 S.W.2d at 274. Instead, "a trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." Id. We hold that the trial court complied with this requirement, considered the mitigating factors of remorse and admission of guilt pursuant to Tennessee Code Annotated section 40-35-113(13) ("[a]ny other factor consistent with the purposes of this chapter"), and implicitly determined that neither was established by sufficient proof to be accorded any weight.

In terms of the two enhancement factors that the trial court determined were established by the proof, it accorded them "great weight." The one mitigating factor that the trial court determined was established by the proof was accorded "very little weight" based on "the circumstances of this case." A trial court's weighing of enhancement and mitigating factors is "left to the trial court's sound discretion." Carter, 254 S.W.3d at 345.

In addition, when a trial court imposes a sentence involving incarceration, as the trial court did in this case, that determination must be based on the following sentencing considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

See Tenn. Code Ann. § 40-35-103(1) (2010).

During the sentencing hearing, the trial court determined that, based on the Defendant's criminal history, "it's important to keep him away from society for as long as

possible," and it also determined, as stated above, that the Defendant had been "revoked from previous probationary periods." Both of these findings are supported by the record. As previously stated, the Defendant has an extensive prior criminal record. The Defendant's record of criminal convictions began in 1993, and consists of, for example, convictions for two counts of indecency with a child, two counts of indecent exposure, attempted kidnapping, assault, and failure to register as a sex offender. Further, as stated above, the record reflects that the Defendant's prior probationary periods have been revoked at least twice. The record established that the Defendant's probation was revoked for both of his indecency with a child convictions and for his attempted kidnapping conviction.

For these reasons, the trial court did not act arbitrarily in ordering the Defendant to serve seventy-five percent of his sentence in each count in actual confinement. The imposition of seventy-five percent service is consistent with the Sentencing Act.

Finally, the trial court also determined that the Defendant shall serve all of his sentences consecutively. The Defendant only challenges his sentence based upon his assertion that the trial court failed to consider two mitigating factors. The Defendant does not address consecutive sentencing in his brief. Accordingly, any challenge to the trial court's imposition of consecutive sentences has been waived. See Tenn. Ct. Crim. App. 10(b).

In sum, the trial court imposed the maximum sentence available, ordered the maximum percentage to be served in actual confinement, and ordered all of the sentences to be served consecutively. We hold that the trial court imposed these sentences in a manner consistent with the purposes, principles, and goals of the Sentencing Act. Thus, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

-11-