FILED

04/25/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 21, 2017

**STATE OF TENNESSEE v. MARK ODEN POTTS**

**Appeal from the Circuit Court for Bedford County**
**No. 18281     Franklin L. Russell, Judge**

_____

**No. M2016-02079-CCA-R3-CD**

_____

Defendant, Mark Oden Potts, pled guilty to various drug-related offenses.  He received an effective sentence of eight years as a standard offender.  On appeal, he argues that the trial court abused its discretion by denying an alternative sentence of probation or community corrections.  After reviewing the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. ROSS DYER, JJ., joined.

Donna L. Hargrove, District Public Defender, and Andrew Jackson Dearing III, Assistant Public Defender, for the appellant, Mark Oden Potts.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Summary and Procedural History*

Defendant was indicted for: (1) possession of .5 grams or more of methamphetamine for resale, a Class B felony; (2) possession of .5 grams or more of methamphetamine for delivery, a Class B felony; (3) simple possession of marijuana, a Class A misdemeanor; and (4) possession of drug paraphernalia, a Class A misdemeanor. Defendant pled guilty as charged, and the State presented the following factual basis for the offenses:

[O]n December 11, 2015, agents of the Drug Task Force met with a confidential informant about purchasing approximately an ounce of methamphetamine from Gina Plant and the defendant. The price that was agreed upon between Gina Plant and the confidential informant was $1750 for the ounce.

The confidential informant then met with Gina Plant at a location here in Bedford County, where the confidential informant fronted the money to Ms. Plant, and was expected to be contacted at either later that day or possibly a later date, when she actually had the drugs in hand.

She was then observed after that exchange took place. The defendant was observed coming to the same location, picking Ms. Plant up, they went back to the defendant's residence for a period of time. They then returned to that location, and Ms. Plant was returned to her vehicle and she left.

The defendant was then followed, and he ultimately left town. He went to Murfreesboro. I believe at the Walmart parking lot he met with an individual [and] was observed in a hand-to-hand exchange with that individual. And they then parted ways. The defendant continued to be followed. By now it's into the evening hours, approaching midnight.

The defendant went to a residence in Williamson County. He stayed for a period of time and then he left. He was making his way, he ultimately returned back here to Bedford County, where a traffic stop was made.

. . . [A] search of the vehicle revealed methamphetamine. It was sent to the lab. It weighed 17.4 grams. There was a small amount of marijuana that was found. There were . . . digital scales, baggies, and I believe a glass pipe. . . . [T]he individual that the defendant met with in the Walmart parking lot in Murfreesboro, he too was stopped and identified. And . . . from his person was recovered $950 of the money that was given by the confidential informant to Ms. Plant. The defendant was found to be in possession of only $20 of the money. . . . [A]t a later date, Ms. Plant was interviewed, and she acknowledged that she kept $200 herself. . . . The defendant elected not to be interviewed.

The trial court held a sentencing hearing to determine the length and manner of service of Defendant's sentences. At the sentencing hearing, the State introduced a copy of the pre-sentencing report. Officer Shane George of the Shelbyville Police Department testified that he had been with that office for seventeen years, sixteen of which were also

served on the 17th Judicial District Drug Task Force. Through Officer George's experience on the Drug Task Force, he has received additional training on the manufacture, distribution, and usage of methamphetamine. Officer George had investigated "countless cases of individuals being involved in the making and distribution of" methamphetamine. He had also encountered "a number of persons who were addicted to that drug" because methamphetamine is "highly addictive."

Officer George explained that there is a common form of methamphetamine known as "shake and bake" or "one pot meth," which is created using pseudoephedrine, and there is a purer form of methamphetamine known as "ice." Regarding the former, Officer George explained:

[T]he shake and bake problem I've been investigating here probably for the past eight or nine years. If I was to estimate, . . . for that period of time, it was the overwhelming scourge on the 17th District. The pharmacies were getting blown down by people that were smurfing for pseudoephedrine. They would come in at the peak of all this activity . . . three, four, five people deep lining up in the pharmacy lines, all to get as much pseudoephedrine as they could get. And once law enforcement and the law makers saw that that was happening, of course they enacted laws to combat that. And it helped for a short period of time, but then [they] revamped the methods that they would use to get the pseudoephedrine . . . . And then, they were sidestepping a lot of the implementations that were in place, just maybe five years ago. So, every step that law enforcement took to try to lessen the impact of that drug on the community, the users, the producers, the people that were selling the drug just for monetary gain were sidestepping those implementations. And the reason for it is because the people that get hooked on this drug, it's very hard to get off it. In fact, it's almost zero percent that you're going to get off this drug without some very intense professional help. And the majority of the people out here that are hooked on this drug either can't afford the professional help or don't have the support network from family and friends that they need to even attempt to get off of it. So, . . . once the people experience the drug, they're pretty much hooked from that point forward. And it's in the process right now of knocking crack cocaine and cocaine off the streets. Now, the street gangs . . . have picked up moving the ice. So, it's just continuing to morph into an even bigger problem than it was.

Officer George opined that there was a significant need to deter the illegal distribution of methamphetamine in the community because he had "personally seen a number of people" become addicted to the drug and lose everything. Because it is so

difficult to be rehabilitated from a methamphetamine addiction, Officer George explained that "jail is the only place for a person that's going to keep them from the drug."

Officer George testified that he was involved in the investigation of Defendant in this case. Prior to the investigation in this case, Officer George first learned of Defendant through reports that he was "allowing his residence to be used as a safe haven for meth cooks." Officer George eventually arrested one of the cooks, who admitted to Defendant's role in the scheme. Defendant would allow his home to be used in exchange for a portion of the finished product. Defendant was also ordering "ice" through FedEx, which would eventually make its way to the streets for distribution.

Bill Caskey testified for the defense that he met Defendant in the late 1990s because Defendant was a teacher at the same school as Mr. Caskey's wife. Mr. Caskey and Defendant developed a friendship through a mutual interest in college baseball. Defendant was a "very successful girls' basketball coach." Eventually, Defendant began providing lawn care services to Mr. Caskey for "eight or ten years." Defendant did an "excellent" job. Mr. Caskey was familiar with Defendant's two children, whom he described as "good kids." Mr. Caskey also knew Defendant's "caring mother."

Throughout the course of their friendship, Mr. Caskey never suspected Defendant of drug use. During the summer of 2014, Defendant ceased all communication with Mr. Caskey. When Mr. Caskey learned that Defendant was incarcerated, he went to visit him at the jail. Defendant "was remorseful that he had hurt his family and his friends." Defendant wanted to be rehabilitated and "to get his life straightened out." Mr. Caskey asked the court to show leniency and to help Defendant get rehabilitation.

Sheila Bearden Trolinger testified that she used to be Defendant's girlfriend for a few years in the early 2000s. During their time together, she never suspected Defendant of using illegal drugs. After the couple broke up, Ms. Trolinger continued to help take care of Defendant's mother, who has some heart and blood pressure issues. At the time of the hearing, Defendant's mother had recently turned eighty-eight years old. She has no living relatives other than Defendant, her only son. Ms. Trolinger testified that she needs Defendant's help to provide adequate care for Defendant's mother. The condominium Defendant's mother rented for four years was sold, and there was no one to help her move. Ms. Trolinger did not think that she would be able to move Defendant's mother on her own.

Ms. Trolinger spoke with Defendant numerous times since he was arrested and also visited him at the jail. She felt that Defendant was sincere about his desire to get his life back in order. Ms. Trolinger asked the court to give Defendant an opportunity to be rehabilitated and to return to helping his family.

Defendant made an allocution to the court, in which he described the positive influences he had growing up. His father died when he was six years old. Defendant recounted his many successes as a teacher and a coach. He retired from education to focus on his lawn care business and to take care of his family. He began to have health problems, having developed a painful case of plantar fasciitis and pneumonia. Defendant described the accomplishments of his two children and the needs his mother has due to her health troubles. Defendant stated his desire to be rehabilitated from his drug addiction and apologized for hurting and disappointing his family and the community.

After hearing the proof, the trial court merged both of the felony convictions for possession of an illegal substance with intent to sell or deliver and found Defendant to be a standard offender. The trial court remarked that this was "a very difficult case." Defendant had a minor history of criminal convictions for driving while impaired and resisting arrest, but the trial court was more concerned with the hearsay reports of Defendant's extensive involvement with the manufacture of methamphetamine. However, the trial court chose not to give "a great deal of weight" to Defendant's criminal behavior and criminal history. The trial court imposed a minimum sentence of eight years for possession of .5 grams or more of methamphetamine with intent to sell or deliver. The trial court imposed sentences of eleven months and twenty-nine days for both of the misdemeanors. All sentences were to be served concurrently.

On the issue of alternative sentencing, the trial court opined, "Quite frankly, if he were given probation, I'd be signing his death warrant." The trial court was very concerned about the risk of relapse. The trial court took note of Defendant's positive contributions to the community and remarked that Defendant "had an incredible number of friends, who loved him dearly," over the course of his life. The trial court found that incarceration was the best means of rehabilitation for Defendant. The trial court further found that incarceration was necessary to avoid depreciating the seriousness of the offense in a county with "an absolute epidemic of ice." Accordingly, the trial court denied alternative sentencing.

Defendant filed a timely notice of appeal.

*Analysis*

Defendant argues that the trial court abused its discretion by denying alternative sentencing. The State disagrees.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d

682, 707 (Tenn. 2012). The same standard of review applies to a trial court's decision regarding "probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

A trial court considers the following factors when determining the sentence for a criminal conviction: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102,-103,-210; *see also Bise*, 380 S.W.3d at 697-98.

Tennessee Code Annotated section 40-35-102(3)(C) provides that "[p]unishment shall be imposed to prevent crime and promote respect for the law by . . . [e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs that elicit voluntary cooperation of defendants[.]" Tennessee Code Annotated section 40-35-104(c)(9) authorizes a "sentence to a community based alternative to incarceration . . . ." Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed," and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" T.C.A. § 40-35-103(5).

A defendant is eligible for probation if the sentence imposed is ten years or less. T.C.A. § 40-35-303(a). Although "probation shall be automatically considered by the court as a sentencing alternative for eligible defendants," the defendant bears the burden of "establishing suitability" for probation. T.C.A. § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). A defendant who is sentenced as an especially mitigated or standard offender and who has committed a Class C, D, or E felony should be "considered as a favorable candidate for

alternative sentencing options," if certain conditions are met. T.C.A. § 40-35-102(5), (6)(A). The guidelines regarding favorable candidates are advisory. T.C.A. § 40-35-102(6)(D). In this case, Defendant was convicted of a Class B felony and received an eight-year sentence. Therefore, although Defendant was eligible for alternative sentencing, he was not a favorable candidate for alternative sentencing.

The purpose of the Community Corrections Act of 1985 was to "[e]stablish a policy within the state to punish selected, nonviolent felony offenders in front-end community based alternatives to incarceration, thereby reserving secure confinement facilities for violent felony offenders[.]" T.C.A. § 40-36-103(1). Eligible offenders under the Community Corrections Act include:

> (A) Persons who, without this option, would be incarcerated in a correctional institution;
>
> (B) Persons who are convicted of property-related, or drug- or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;
>
> (C) Persons who are convicted of nonviolent felony offenses;
>
> (D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
>
> (E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; and
>
> (F) Persons who do not demonstrate a pattern of committing violent offenses.

T.C.A. § 40-36-106(a)(1). However, simply because an offender meets the minimum requirements under the Community Corrections Act "does not mean that he is entitled to be sentenced under the Act as a matter of law or right." *State v. Ball*, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998) (citing *State v. Taylor*, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987)). Instead, the Act's criteria "shall be interpreted as minimum state standards, guiding the determination of eligibility of offenders under this chapter." T.C.A. § 40-36-106(d).

Tennessee Code Annotated section 40-35-103(1) dictates that sentences involving confinement be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

In this case, the record demonstrates that the trial court carefully considered the purposes and principles of the Sentencing Act as well as the sentencing factors. The trial court was candid that this was a very difficult case involving an individual who historically enjoyed good standing within the community and who made substantial contributions to the community during his career in education. Unfortunately, however, Defendant's life unraveled due to a powerful addiction to methamphetamine.

The trial court considered the nature of the offenses and Defendant's potential for rehabilitation. The trial court heard testimony from character witnesses about Defendant's success as a father, his family's needs, and his remorse. The trial court also heard an untested allocution indicating a desire for rehabilitation. Ultimately, the trial court concluded that the best chance for Defendant's rehabilitation was through incarceration given the highly addictive nature of methamphetamine. In that regard, the trial court was genuinely concerned with Defendant's personal wellbeing. Although Defendant was a prima facie candidate for Community Corrections, the trial court found that confinement was necessary to avoid depreciating the seriousness of methamphetamine-related crimes. On this point, the trial court heard testimony that methamphetamine use in that part of the State of Tennessee has become an epidemic. After reviewing the record, we cannot say that the trial court abused its discretion by denying alternative sentencing. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE