IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 28, 2020 Session

**STATE OF TENNESSEE v. FREDDIE L. SMITH**

**Appeal from the Criminal Court for Knox County**
**No. 112604    Steven W. Sword, Judge**

_____

**No. E2019-00999-CCA-R3-CD**

_____

The Defendant, Freddie L. Smith, was convicted upon his guilty pleas of four counts of
identity theft, a Class D felony. *See* T.C.A. § 39-14-150 (2018). The Defendant pleaded
guilty as a Range II offender and agreed to an effective eight-year sentence. The manner
of service of his sentence was reserved for the trial court's determination. On appeal, the
Defendant contends that the trial court erred by imposing incarceration rather than an
alternative sentence. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT
W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Freddie L. Smith.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant
Attorney General; Charme P. Allen, District Attorney General; William Bright, Assistant
District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to his involvement in "Felony Lane Gang
activity." The grand jury returned a thirty-count indictment, charging the Defendant with
multiple counts of burglary of an automobile, identity theft, forgery, and felony theft.
According to the State's recitation of the facts at the guilty plea hearing, the Defendant,
along with codefendants James Austin and Antonio Battle, broke into vehicles owned by
women in order to steal their checkbooks, credit and debit cards, and identification. The
operation involved forging signatures on the stolen checks and sending women, who
were dressed to look like the victims, to cash the fraudulent checks from the drive-
through lanes at various banking institutions. The Defendant and his codefendants

observed the transactions at the banks and provided assistance to the women when necessary.

Between September 20, 2017, and September 26, 2017, the Defendant and his codefendants broke into four vehicles, which were owned by Jennifer Fields, Deborah Wolford, Joan Dunn, and another woman whose identity is not relevant to this appeal. There were additional automobile burglaries, as well. On September 20, an unidentified woman, who used Ms. Field's stolen identification, cashed a check made payable to Ms. Fields for an unspecified amount from a financial account belonging to Michael Sinkman. On September 26, an unidentified woman, who used Ms. Dunn's stolen identification, cashed a check made payable to Ms. Dunn in the amount of $1,920 from a financial account belonging to Ms. Wolford. On October 2, an unidentified woman, who used Alicia McCloud's stolen identification, cashed a check made payable to Ms. McCloud from a financial account belonging to Sharon Mongalon. In another incident, an unidentified woman, who used Ms. McCloud's stolen identification, cashed a check made payable to Ms. McCloud in the amount of $1,920 from a financial account belonging to Justin and Linda Gilbert.

In each incident, the Defendant wrote the forged checks. The unidentified woman drove to the banks and cashed the forged checks using the stolen identifications. The woman maintained constant contact with the Defendant and the codefendants, all of whom acted as police lookouts. They devised a plan to "meet up and switch drivers" to aid in a getaway if problems arose at a bank. Upon the Defendant's arrest, he possessed $572, which the State maintained were proceeds from the criminal activity.

At the sentencing hearing, the presentence report was received as an exhibit and reflected that the Defendant had previous convictions from Florida, Illinois, and Georgia, involving first degree burglary, two counts of driving when his license was revoked or suspended, automobile burglary, grand larceny, criminal trespass, vandalism valued to $500 or less, an undefined theft-related offense, reckless driving, habitual traffic offender violation, and criminal impersonation.

The Defendant reported graduating from high school in 2005, having fair mental health, and having excellent physical health, although he had been suffering from stress and depression since the 2016 death of his mother. He reported receiving treatment for depression during his pretrial confinement but denied taking prescription medications. He stated that he first drank alcohol at age twenty-two and that he had used marijuana, cocaine, "flaaca," and "DMA." The Defendant stated that he entered but did not complete a drug treatment program in 2016.

-2-

The Defendant reported that his son and two daughters lived in Florida. The Defendant stated he had a good childhood and a good relationship with his family. He stated that he did not establish residence in Tennessee and was only visiting at the time of the offenses. The Defendant reported employment in the service industry between 2009 and 2012.

Knox County Sheriff's Detective Bradley Cox testified that "[f]elony lane gang" is a group, usually from Florida, that travels the country and targets vehicles driven by women. He said that the group targeted women's vehicles parked at locations at which women were likely to leave personal information inside their vehicles. He noted the typical locations included daycares, fitness centers, and parks. He said that participants in these groups watched women park and leave their vehicles, that they took the women's purses inside the vehicles, and that they took the stolen items to a hotel. He said that a female member of the group was dressed to look like the victims, as depicted in the driver's license photographs, that someone forged signatures on the stolen checks, and that the female member drove to a bank to cash the check. He said that the female usually went through the drive-through at the bank because the security camera quality was not as good as the cameras inside the bank and that the female wore an ear piece to communicate with the remainder of the group. He said that the vehicles driven by the female were generally stolen or displayed stolen license plates.

Detective Cox testified that an increased number of automobile burglaries were reported around September 20, 2017, which included the burglaries of vehicles owned by Ms. Fields, Ms. Wolford, and a third woman whose identity is not relevant to this appeal. He said that around September 26, he received a telephone call from a local bank's fraud investigator stating that a fraudulent check had been passed and that the check was tested for fingerprints. Detective Cox said that the Defendant's fingerprints, along with Jennifer Nichols's fingerprints, were found on the check. Detective Cox identified Ms. Nichols's as the woman who cashed the fraudulent check at the bank. Detective Cox said that "this activity" continued for approximately seven days and that multiple women passed fraudulent checks for the Defendant and the codefendants. Detective Cox identified these women as Tosha Partin, Erica Stearns, Barbara Schoop, and Lenise Dowell.

Detective Cox testified that the Defendant was arrested at a hotel and that the room was searched pursuant to a warrant. Detective Cox testified that during the search, an Enterprise rental agreement showed that the Defendant's car was rented in Florida. Detective Cox said female wigs with human hair were found, along with multiple identifications and credit cards. Detective Cox said that these did not belong to the Defendant, the codefendants, and the women who participated in the criminal operation. Detective Cox stated that a license plate and a window punch, which he said was used to punch out vehicle windows, were also recovered. He said that inside a tissue box the

deputies found personal checks belonging to a person who lived in New Mexico. Photographs of the items recovered were received as an exhibit.

Detective Cox testified that felony lane gang criminal activity was distinct from "opportunistic" vehicle burglaries in that felony lane gang activity required the use of a woman, who drove a vehicle in a bank's drive-through lane, attempting to cash a fraudulent check. He stated that the targeted vehicles in felony lane gang enterprises involved female victims who parked their vehicles at daycares, parks, fitness centers, and other places at which women are likely to leave their purses inside their vehicles. Detective Cox said that felony lane gang had become a problem in Knox County and that, during the previous three years, banks had lost approximately $200,000 to $300,000 in addition to the victims' financial losses and personal property damage. Detective Cox said that, during the three years he had investigated these types of offenses, he had investigated approximately twenty to thirty felony lane gang groups and that he had only identified the men from two groups. He said that these offenses occurred at least once per month, if not more.

On cross-examination, Detective Cox testified that, on average, two to five automobile burglaries were reported daily in Knox County but that the sheriff's department did not engage in data collection for this type of offense. When asked how the sheriff's department determined a "spike" in automobile burglaries, the detective said that "this is just from a day to day." He said, though, that the frequency of the offense usually increased during December. He stated that he did not know the total loss attributed to shoplifting and that he did not know how the $200,000 to $300,000 losses attributed to felony lane gang activity compared to other types of criminal offenses.

Kelly Johnson, a fraud specialist at ORNL Federal Credit Union, testified that on October 3, 2017, her institution suffered a loss as a result of felony gang lane activity. She identified photographs of the drive-through lanes at two credit union locations. She said she was notified that, on October 3, a check in the amount of $1,960 had been cashed by someone other than the member associated with the account. She said that, on the same day but at another location, someone attempted to cash an additional check from the same account. She said that although the woman who attempted to cash the second check presented the bank teller with Jacqueline Copeland's identification, the teller did not believe the woman in the drive-through lane was Ms. Copeland. Ms. Johnson said that the woman drove away without the check and without Ms. Copeland's identification and debit card. Ms. Johnson said that the check was made payable to Ms. Copeland from a First Tennessee Bank account belonging to Celeste Critselous. Ms. Johnson said that four checks from Ms. Copeland's credit union account were presented for cashing at Sevier County Bank in the amounts of $2,420, $1,930, $2,250, $1,500 and that two First Tennessee Bank checks made payable to Ms. Copeland were presented for cashing.

Ms. Johnson testified that the credit union described felony lane gang activity as involving the theft of a member's identification, checks, credit cards, and debit cards and a person's posing as a credit union member attempting to cash a check from a different financial institution in a drive-through lane. She said that this type of criminal activity was "a large problem" because the credit union suffered financial loss when it reimbursed members for the fraudulent transactions, which impacted the "overall fees and interest rates" for all of the credit union's members. She noted that the perpetrators were apprehended rarely. She said that between 2015 and 2018, the credit union had suffered a total loss of $51,655.84.

On cross-examination, Ms. Johnson testified that the manner in which a check was cashed was the determining factor in whether the credit union classified a fraudulent transaction as felony lane gang activity. She said gender of the victim was not considered in this determination. She agreed that on average the credit union lost about $12,913.96 annually from felony lane gang activity and said that the credit union suffered higher annual losses from credit card fraud. She agreed that perpetrators of credit card fraud were arrested more frequently than those who participated in felony lane gang activity.

In an allocution, the Defendant noted the significant impact of his mother's death and said he used controlled substances and drank alcohol to cope. He said that he made poor choices following his mother's death, that he associated with the "wrong group of friends," and that he had not been in a "right state of mind." He stated that he pleaded guilty because he regretted his conduct and wanted to take responsibility for what he had done. He said that he had "been going through a lot and my family want me home." The court noted the Defendant had been in confinement for 605 days, and the Defendant said, "It's been a lot to deal with 'cause I didn't get to properly grieve my mother."

The trial court determined that the Defendant's criminal history consisted only of property crimes and noted that crimes of violence were more favored for confinement. The court determined that the Defendant's history of felony property crimes began in 2007, that the Defendant had five burglary- and theft-related convictions, that the convictions spanned four states and ten years. The court found that although the Defendant's criminal history was not "shockingly long," the Defendant had a long criminal history warranting confinement. The court determined the circumstances of the offense did not warrant confinement because the Defendant did not threaten anyone during the commission of the offenses and because a significant amount of money had not been stolen, although the amounts were significant to the banks and credit unions.

The trial court determined that the State had presented sufficient evidence showing that confinement was necessary to provide an effective deterrent to others who might commit similar offenses. The court found, based upon the sentencing hearing testimony, that felony lane gang activity was "a problem" in Knox County and that perpetrators were

-5-

apprehended rarely and that confinement in these types of cases would serve as a deterrent to others who were orchestrating "these enterprises." The court, likewise, determined that less restrictive means than confinement had been unsuccessful for the Defendant, noting the presentence report showed that the Defendant had served time in prison, and that the Defendant had not "changed his ways."

The trial court found that although the Defendant had a history of marijuana use, the record did not show that drug use was the cause of the Defendant's criminal behavior. The court found that the Defendant lacked a potential for rehabilitation, although the court credited the Defendant's statement that he wanted to take responsibility for his conduct. The court did not believe that the Defendant had made excuses for his conduct but determined that the lengthy criminal history and "failure to respond to being convicted outweighs . . . his attitude and desire to change." The court determined that the Defendant had not shown "any propensity" to change his behavior other than when he had been incarcerated.

The trial court determined that, regardless of the deterrence, confinement was warranted based upon the "number of folks that have been victimized" and the Defendant's five previous burglary- and theft-related convictions before the present case. The court found that split-confinement was insufficient to "meet the ends of justice." The court ordered the Defendant to serve his eight-year sentence in confinement. This appeal followed.

The Defendant contends that the trial court erred by denying his request for alternative sentencing. He asserts that the court placed undue weight upon his previous convictions and improperly relied upon deterrence. The State responds that the court did not abuse its discretion by denying probation. We agree with the State.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2018). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

(A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2018); *see Trotter*, 201 S.W.3d at 654.

The Defendant pleaded guilty as a Range II offender. As such, he was not entitled to the presumption that he was a favorable candidate for an alternative sentence. *See id.* § 40-35-102(6)(A) (2018).

The record reflects that the trial court denied the Defendant's request for alternative sentencing based, in part, upon the Defendant's ten-year criminal history and because the Defendant had continued to engage in criminal conduct after having served previous terms of confinement and probation. *See id.* § 40-35-103(1)(A), (C). The presentence report reflects that, before the present case, the Defendant's criminal history spanned three states and involved multiple theft- and burglary-related offenses. The Defendant had been convicted of first degree burglary, automobile burglary, and grand larceny, along with criminal trespass, vandalism, criminal impersonation, reckless driving, driving with a revoked license, and habitual traffic offender. The Defendant's previous criminal history began at age nineteen and continued to age twenty-six. The Defendant was approximately thirty years old at the time of the present offenses. The Defendant had served time in confinement for his previous convictions, most notably six years for first degree burglary and more than one year for automobile burglary, but continued engage in burglary- and theft-related offenses. As a result, the record supports the court's determinations that the Defendant had a long history of engaging in burglary- and theft-related conduct, that he lacked the potential to rehabilitate, and that he had failed to show a propensity to change his behavior. We conclude that the trial court did not abuse its discretion in concluding that the confinement was warranted based upon the Defendant's previous history of conduct and upon the Defendant's failure to rehabilitate after previous terms of confinement and probation. The trial court's determination in this regard alone was sufficient to order the Defendant to serve his sentence in confinement.

In any event, the trial court also denied the Defendant's request for alternative sentencing based, in part, upon the need to deter others from committing similar offenses. *See id.* § 40-35-103(1)(B). The court credited Detective Cox's testimony that felony lane gang activity had increased in recent years in Knox County and that banks in the area had

suffered an estimated aggregate loss of approximately $200,000 to $300,000, which was in addition to the victims' financial and property losses. Likewise, Detective Cox testified that although these types of enterprises were increasing in frequency during the previous three years, it was uncommon to apprehend the perpetrators. Detective Cox had investigated twenty to thirty felony lane gang groups but had only identified men from two of them. Additionally, the court credited fraud specialist Kelly Johnson's testimony that ORNL federal credit union's approximate annual loss from felony lane gang enterprises was nearly $13,000 and that the perpetrators were apprehended rarely. She testified that this type of activity was "a large problem" because the credit union's losses impacted the overall fees and interest rates for all of the members. Based on this credited testimony, the trial court determined that confinement would provide a deterrent to others who might engage in these types of criminal enterprises. The record supports the court's determination. We conclude that the trial court did not abuse its discretion in concluding that the confinement was warranted based upon the need to deter others from committing similar offenses.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE